Donna **BERTOT**, Plaintiff-Appellant,

v.

**SCHOOL DISTRICT NO. 1, ALBANY COUNTY, WYOMING, et al.,** Defendants-Appellees.

Martha **SWEENEY**, Plaintiff-Appellant,

v.

**SCHOOL DISTRICT NO. 1, ALBANY COUNTY, WYOMING, et al.,** Defendants-Appellees.

No. 74–1030.

United States Court of Appeals, Tenth Circuit.

July 16, 1975.

Rehearing Denied Aug. 14, 1975.

Rehearing and Rehearing En Banc Denied Aug. 14, 1975.

Michael H. Gottesman, Washington, D.C. (George H. Cohen and Dennis D. Clark of Bredhoff, Cushman, Gottesman & Cohen, Washington, D.C., and Charles E. Graves, Cheyenne, Wyo., on the brief), for plaintiffs-appellants.

Alfred M. Pence, Laramie, Wyo. (Pence & Millett, Laramie, Wyo., on the brief), for defendants-appellees.

Before LEWIS, Chief Judge, and HOLLOWAY and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

These are civil rights cases in which two public school teachers complain that a local school board violated their constitutional rights in not renewing their contracts. Plaintiffs-appellants Mrs. Donna Bertot and Mrs. Martha Sweeney, who taught at Laramie High School in Laramie, Wyoming, alleged that the defendants-appellees' non-renewal of their contracts was, at least in part, in retaliation for exercise of their First Amendment rights, and also that their right to procedural due process guaranteed by the Fourteenth Amendment was violated by the procedures followed by the defendants.

Plaintiffs brought separate suits under 42 U.S.C.A. § 1983, and the Federal Constitution, claiming jurisdiction under 28 U.S.C.A. §§ 1331 and 1343. They sought damages and declaratory and injunctive relief against defendants in their official and individual capacities. Plaintiffs' cases were consolidated and tried to a jury, which found for the defendants. The trial court denied motions for judgment notwithstanding the verdicts and entered judgment on the verdicts, and this appeal followed.

Plaintiffs raise two main issues on appeal: (1) that the court erred in refusing to submit the procedural due process issue to the jury, and in not directing a verdict for them on the issue; and (2) that the proof clearly established that the non-renewals were at least in part in retaliation for exercise of First Amendment rights so that the trial court erred in failing to enter judgment for plaintiffs notwithstanding the verdicts. Since both issues necessitate analysis of the evidence, we will defer discussion of the details of the proof until we treat the issues. The general background facts are as follows.

Both appellants were recent honor graduates of the University of Wyoming. Mrs. Sweeney was a Phi Beta Kappa graduate in 1968 with a bachelor's degree in mathematics and a minor in English, and started teaching both subjects at Laramie High School that autumn. She was re-employed in 1969–70, and again in 1970–71. Mrs. Bertot, also Phi Beta Kappa, began teaching at Laramie High School in the autumn of 1969, having graduated with a bachelor's degree in English the previous spring. She taught sophomore English, including several honors sections, and was re-employed in 1970–71. At this point the plaintiffs were "initial contract teachers" as defined by the Wyoming statutes, see n. 2, infra, having no statutory rights to tenure or to hearings before a decision not to renew their contracts.

In March, 1971, the Albany School District Board of Trustees voted not to renew the teaching contracts of both Mrs. Sweeney and Mrs. Bertot. Both had been recommended for re-employment "with some reservations" by their building principal, Dr. Ludwick. Of 65 teachers at Laramie High School whose contracts were being reviewed by the school board, appellants were the only two whose re-employment was recommended with reservations. There were no recommendations against renewal.

At several meetings the Personnel Committee—composed of three of the six Board members, Dr. Ludwick, and the Superintendent of District Schools, Dr. Conklin—discussed the cases of Mrs. Sweeney and Mrs. Bertot. Dr. Ludwick was asked to give his reasons for his reservations, and the Committee also heard from Dr. Conklin. The teachers were not called before the Committee and were not heard. On March 10 the Committee presented to the full Board, in executive session, its recommendation that neither teacher's contract be renewed. After further discussion the Board, with one member absent, so voted. Again, neither teacher was called before the Board. The plaintiffs learned of the board action by a letter on March

15. At the teacher's requests, several meetings with the Board and with school officials were held later. Following the Board's refusal to change its position, the plaintiffs brought suit.

At trial the plaintiffs' positions were essentially that the defendants denied them procedural due process by failure to afford several required rights in determining not to renew their contracts, and that the decisions were in retaliation for exercise of their First Amendment rights. The defendants mainly argued that there was no tenure or property right possessed by the plaintiffs, making unnecessary any of the special procedural steps whose omission is complained of by the plaintiffs. And the defendants' position further was that several inadequacies of the plaintiffs were the reasons for the non-renewal of their contracts, and not any retaliation for exercise of constitutional rights.

The case was submitted to the jury on a charge covering the plaintiffs' theory of their First Amendment claims, and the defendants' denials of liability and their assertions of immunity. The trial court refused to submit any factual question on the procedural due process claims, instructing the jury that at the time of their termination the plaintiffs were initial contract or non-tenured teachers, and that their contracts could be terminated without notice and without a hearing, so long as they were notified in writing by March 15 (Tr. 937). The plaintiffs objected timely to the failure to instruct on the procedural due process issue. Both sides made other objections to the charge as well, but none of them is urged on appeal.

Under the charge the case was submitted to the jury on special interrogatories and for a general verdict as to each plaintiff. The first interrogatories asked for a jury finding whether the defendants acted in good faith in failing to renew the teaching contracts of the plaintiffs, and the jury answered "Yes" as to both plaintiffs. The second inquired whether the defendants acted maliciously and for purposes of retaliation in failing to renew the teaching contracts, and the jury answered "No" as to both plaintiffs. The jury also returned a general verdict finding the issues for the defendants individually and in their official capacities. Judgments were entered on the verdicts, denying all relief, and plaintiffs' subsequent motions for judgment notwithstanding the verdicts were denied.

We turn now to the two main issues raised by plaintiffs on the appeal.

### 1. *The procedural due process claims*

The plaintiffs argue that their procedural due process claims were improperly rejected by the trial court. They assert error in the refusal of the court to submit the factual question of whether they had a sufficient property interest in their continued employment so as to require observance of due process procedures before termination, relying on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570. They also complain of the instruction to the jury that there was no issue as to proper notification, right to a hearing or notice (Brief for Plaintiffs-Appellants, 38–39).[1]

 In such a context our function in examining the proof is a narrow one. Although a scintilla of evidence is not sufficient to justify submitting a case to the jury, a verdict may not be directed unless the evidence points all one way

---

1. The procedural deficiencies alleged include, *inter alia,* failure to afford a due process hearing prior to the determination not to renew their contracts; making of the decision prior to meeting with plaintiffs; lack of adequate advance notice of reasons for non-renewal; failure to receive evidence in support of non-renewal, thus denying the right to a decision on record evidence, and merely allowing the plaintiffs to respond to stated reasons for non-renewal, without being able to confront and cross-examine adverse witnesses; lack of opportunity to present their witnesses; denial of presence or participation of their counsel; and failure to articulate reasons for the Board's actions or the evidence relied on.

and is susceptible of no reasonable inferences which sustain the position of the party against whom the motion therefor is made. *Wilkin v. Sunbeam Corp.,* 377 F.2d 344, 347 (10th Cir.). However, when the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, a directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.C. 232, 88 L.Ed. 239.

Plaintiffs argue that they introduced evidence establishing a prima facie case that they possessed a "property" interest in continued employment, raising at least a fact question. Cf. *Perry v. Sindermann,* 408 U.S. 593, 596, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570. Without relying on state law, plaintiffs point to words, acts and past rehiring practices of the District as showing such a property interest. They say that refusal to submit the issue, or to direct a verdict in their favor on it, was error.

Under Wyoming statutes a public school teacher is classed generally as a "continuing contract teacher" or an "initial contract teacher." [2] An initial contract teacher who has taught in the system continuously for at least 90 days is hired on an annual basis and must be notified in writing of termination, if such is the case, no later than March 15 of each year. § 21.1–155, Wyoming Statutes Annotated (1973 Cum.Supp.). The plaintiffs' contracts with the District were annual contracts of this sort.

A continuing contract teacher, on the other hand, is employed on a continuing basis from year to year, without annual contract renewal. § 21.1–154. The only requirement of a hearing on a recommendation of termination is for continuing contract teachers, a status not attained by plaintiffs. See § 21.1–158, Wyoming Statutes Annotated (1973 Cum.Supp.). As initial contract teachers, the plaintiffs worked under no statutory or formal contractual provision indicating any expectation of re-employment. *O'Melia v. Sweetwater County School Dist. No. 1,* 497 P.2d 540, 542 (Wyo.).

■■■ However, it is true that absence of an explicit tenure provision may not always foreclose the possibility that a teacher has a "property" interest in re-employment. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570. Agreements may be implied though not formalized, and explicit contractual provisions may be supplemented by other agreements implied from a promisor's words and conduct in the light of the surrounding circumstances. And the meaning of his words and acts is found by relating them to the usage of the past. Id. at 602, 92 S.Ct. 2694.

Relying on these principles, plaintiffs point to the proof of words and acts of the District's school officials. Mrs. Bertot testified that when she was initially interviewed for employment, the principal, Mr. Newman, had indicated that an important factor in her favor was her intention to be in Laramie permanently, and that the school was happy to have teachers who planned to stay several years (Tr. 196). Mrs. Sweeney relies on her testimony that Mr. Newman's wife initiated the contact with her, saying she seemed to be the only one in the area with the required double preparation in mathematics and English needed for a job opening at Laramie (Tr. 666–67).

---

**2.** The Wyoming statutes define a "continuing contract teacher" as an initial contract teacher who has been employed by the same school district for a period of three consecutive school years, and has had his contract renewed for a fourth consecutive school year, or who achieved continuing contract status in one district, and without lapse of time has taught two consecutive school years and had his contract renewed for a third consecutive school year by the employing school district. § 21.1–152(b), Wyoming Statutes Annotated (1973 Cum.Supp.). An "initial contract teacher" is any teacher who has not achieved continuing contract status. § 21.1–152(d).

Plaintiffs also rely on testimony by Mr. Schilt, a Board member, that the Board had never failed to rehire a teacher since 1966 when he came on the Board, and that he could not even remember any teacher being recommended with reservation (Tr. 365, 393). The superintendent, Mr. Conklin, also said that approximately 90 percent of the initial contract teachers are rehired, and that such teachers would be hired before new ones with whom the District had no experience (Tr. 100–01). Mr. Newman testified that assuming an initial contract teacher's services were satisfactory, she would certainly be re-employed (Tr. 621).

We cannot agree that the proof of the District officials' words or conduct could be found to have established a "property" right to re-employment. The Certified Personnel Handbook issued to teachers in the District states that their first three years of teaching experience shall be considered a "probationary" period (R. III, 391). The hand book then deals separately with continuing contract teachers and procedures for their dismissal (R. III, 392, 393). The handbook provisions are apparently excerpted from the By-Laws and Policies of the Board of Education for the District (R. III, 432; Defendant's Exhibit C, 45). Thus the written materials in the District followed the same pattern as the statutes in recognizing the distinction between an initial contract teacher and a continuing contract teacher and lent no support to the property interest claim as did the local Faculty Guide in *Sindermann, supra* at 600. Cf. *Cusumano v. Ratchford,* 507 F.2d 980, 984 (8th Cir.).

Moreover the defendants' conduct and the statements made to the plaintiffs cannot be equated to promissory representations or to words, conduct and usage importing an agreement. See *Perry v. Sindermann,* 408 U.S. 593, 602, 92 S.Ct. 2694, 33 L.Ed.2d 570. The statements of the school officials as to the rehiring of satisfactory teachers no more than stated obvious facts. The proof showed no "common law" of re-employment. See *Board of Regents v. Roth,* 408 U.S. 564, 578, n. 16, 92 S.Ct. 2701, 33 L.Ed.2d 508.

In sum, we must agree that there was not a sufficient showing of a property interest in the plaintiffs for the issue to go to the jury. We conclude there was no error in refusing to submit the issue or in the instruction that the plaintiffs were subject to termination without a hearing. The Constitution does not require a hearing before non-renewal of a non-tenured teacher's contract, unless he can show that he was deprived of an interest in "liberty"— which these plaintiffs do not claim—or that he had a "property" interest in continued employment, despite the lack of tenure, *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 33 L.Ed.2d 570; *Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 33 L.Ed.2d 548, and here such proof was wholly lacking.

### ·2. *The First Amendment and retaliatory firing claims*

Plaintiffs further argue that the non-renewal of their teaching contracts was, in whole or in part, in retaliation for the exercise of First Amendment rights. This is a separate issue which must be considered, regardless of the status of the plaintiffs as tenured or non-tenured teachers and without regard to their being initial contract teachers who had not become continuing contract teachers under the Wyoming educational system. For even non-tenured teachers cannot be dismissed for exercising their constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 596–98, 92 S.Ct. 2694, 33 L.Ed.2d 570; *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed2d 811; *Adams v. Campbell County School District,* 511 F.2d 1242, 1246 (10th Cir.). Specifically, plaintiffs say that the proof as to this retaliatory firing claim was so strong and clear that the trial court erred in not granting their motions for judgment notwithstanding the verdicts of the jury.

Again we are constrained by a narrow scope of review. These claims

were decided by a jury on special interrogatories and general verdicts against the plaintiffs. Nevertheless if the evidence is such that without weighing credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the case by judgment notwithstanding the verdict or other proper procedure. *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 88 L.Ed. 239. Judgment notwithstanding the verdict may not be granted, however, unless the evidence points all one way and is susceptible of no reasonable inferences that sustain the position of the party against whom the motion is made. *Wilkin v. Sunbeam Corp.,* 377 F.2d 344, 347 (10th Cir.); and see *Davis v. Fox River Tractor Co.,* 518 F.2d 481 (10th Cir.).

█ And we note that in considering such a contention, proof from the plaintiffs as interested witnesses may not be disregarded if it is controlling, positive, uncontradicted, unimpeached by cross-examination or otherwise, and not inherently improbable, and if no circumstances on the record cast doubt on its verity. *Nicholas v. Davis,* 204 F.2d 200, 202 (10th Cir.); see *Chesapeake & Ohio Ry. v. Martin,* 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983.

In evaluating the proof concerning the non-renewal of both teachers' contracts it is important to consider the manner in which the Board reached its decision and the matters relied on in the process, considering both the recommendations to the Board and any additional reasons for their action. *E. g., Smith v. Losee,* 485 F.2d 334, 336–338 (10th Cir.), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212. In the cases of both teachers the original recommendations came from their building principal, Dr. Ludwick. In 1971 he recommended renewal of their contracts "with some reservations." These recommendations were sent to the superintendent, Dr. Conklin, who testified that he usually gives the recommendations of principals automatic approval and that he made no investigation of his own concerning the recommendations as to Mrs. Sweeney or Mrs. Bertot (Tr. 59–60, 537).

Then the Personnel Committee of the Board—consisting of three board members, the superintendent and the principal—considered the recommendations and made its own recommendations to the Board as to both teachers.

### a. *Mrs. Martha Sweeney's case*

The Personnel Committee recommended that Mrs. Sweeney's contract not be renewed. This was discussed by the Board, which agreed and decided not to renew Mrs. Sweeney's contract.

After the Board's decision Mr. Ludwick was asked to prepare a written statement of his criticisms regarding Mrs. Sweeney's work. This statement was introduced in evidence at trial (Plaintiff's Exhibit 16, R. III, 425–27). The criticisms covered three general areas: poor attitude, problems with students, and lack of judgment. Under the judgment factor one paragraph referred to Mrs. Sweeney having involved herself publicly in taking a position contrary to the policy of the school district regarding the school dress code, at the same time the junior and senior high school student councils were meeting with the Board in discussion of possible revisions of the code. The principal's comments stated that "[a]t that point, such public involvement by a school person could quite possibly have hampered the progress being made by the student councils and by the Board." (R. III, 426).

This matter was discussed by the principal with the Board when the renewal of Mrs. Sweeney's contract was considered. Specifically, the incident involves an appearance by Mrs. Sweeney on a radio program in Laramie one Saturday in the fall of 1970 on which the dress code problem was aired. Mrs. Sweeney testified, without contradiction, that she was invited to appear on the program by a student; that the student told her that Dr. Conklin had been invited to appear but that he declined due to lack of time; that the student asked Dr.

Conklin if it was all right if other administrators or teachers appeared; and the superintendent said it would be up to them and was "all right with him." (Tr. 692).

It is this incident which Mrs. Sweeney strongly argues was the basis in whole, or in part, for her termination as a retaliation for exercise of her free speech rights. Mrs. Sweeney relies primarily on her own testimony, the statements by the principal concerning the radio show, and the failure of any of the appellees to provide her with detailed reasons for non-renewal of her contract. She testified she was called into the principal's office the Tuesday after the radio show and that he was upset over her performance. He said he had talked to the superintendent about it. The principal said he noticed she was coming up for tenure and that he was not certain that he wanted a teacher on his staff that did not support School Board policies (Tr. 693). Mrs. Sweeney argues that other reasons for her termination given by the Board are post-hoc rationalizations, and that the proof shows that she was fired, at least in part, for the radio appearance.

However, we must note that each Board member testified at trial that Mrs. Sweeney's appearance on the radio show did not influence his judgment in deciding not to renew her contract (Tr. 797, 836, 843, 848, 859, 861–62, 866). The criticisms that the principal later wrote out also covered other things. And several of the Board members testified of their knowledge of matters apart from the principal's criticisms that influenced the Board's decision (Tr. 626, 835, 846–47, 867), including discipline problems and antagonism of students.

 We must agree that the proof was not all one way or susceptible of no reasonable inferences in favor of the defendants. *Wilkin v. Sunbeam Corp.,* 377 F.2d 344, 347 (10th Cir.). Despite the proof and arguments made for Mrs. Sweeney, we cannot say there was not substantial proof supporting the jury's

responses to the interrogatories and its general verdict. We conclude the judgment in favor of the defendants should be affirmed in Mrs. Sweeney's case.

#### b. *Mrs. Donna Bertot's case*

*The background for the nonrenewal of Mrs. Bertot's contract*

The procedures followed prior to the non-renewal of Mrs. Bertot's contract were similar to those in Mrs. Sweeney's case. A recommendation was made by the building principal, Dr. Ludwick, "with some reservations" that Mrs. Bertot's contract be renewed. This was submitted to the superintendent, Dr. Conklin. He testified that he made no individual investigation in Mrs. Bertot's case. The recommendation stood as the superintendent's recommendation, and was forwarded to the Personnel Committee (Tr. 60).

The Personnel Committee met in an executive session and recommended that Mrs. Bertot's contract not be renewed. The Committee's report was then considered at a regular monthly meeting of the Board, which received information from Dr. Ludwick. The Board then determined not to renew Mrs. Bertot's contract (Tr. 63–64). Mrs. Bertot was notified by a letter on March 15, 1971, of the non-renewal.

At an executive meeting during the latter part of March it was requested that Dr. Ludwick put in writing the reasons and things he had orally expressed to the Board. This was done by the principal. This statement of "Criticisms Regarding the Work of Mrs. Donna Bertot" was introduced at trial (Tr. 65–66; Defendants' Exhibit F, R. 433–34). Dr. Conklin testified at trial that "[s]ignificantly those are the reasons he presented . . . ." and that they were the reasons that Dr. Conklin relied on in supporting Dr. Ludwick's recommendation (Tr. 66).

The written criticisms in this statement are of paramount importance and

are reproduced in the margin.[3] Essentially the statement covers three points: lack of judgment, illustrated by various actions of Mrs. Bertot in connection with an underground student newspaper, and the showing of a film; insubordination or undermining of the principal, again illustrated by allusion to Mrs. Bertot's attitude and actions about the paper; and immaturity, referring to a tendency to place herself on the same level with certain students and doing things such as greeting all students with a peace sign as they entered her classroom. The facts relating to the statement were generally as follows.

Sometime during the fall of 1970 the idea of a class newspaper was brought up in Mrs. Bertot's honors English class. She testified that she told the students class time could not be devoted to the paper, but that she would be willing to produce a paper after class if they desired (Tr. 208). The project was discussed at several meetings of the class with Mrs. Bertot. Shortly after the discussions began, Mrs. Bertot sought the advice of another teacher, Mrs. Hill, asking what she thought Dr. Ludwick would think of such a newspaper. Mrs. Hill said she would ask the principal and did so (Tr. 211, 470). She reported that Dr.

---

**3.** Defendants' Exhibit F, R. 433–34; reads as follows:

### Criticism Regarding the Work of Mrs. Donna Bertot

I. *Lack of Judgment*

Example A.

1. Encouraging the development of a so-called underground student newspaper when no need was shown for such a newspaper.

2. Going to Mrs. Hill regarding questions about the newspaper rather than to Mr. Ludwick to whom she is responsible.

3. Knowing that Mr. Ludwick opposed an underground newspaper, Mrs. Bertot then solicited the aid of a non-staff member to work with the students on it and referred the students to this person (implying to the students that she thought the underground newspaper was a good idea and that they should pursue it further).

4. At no time during this whole process did Mrs. Bertot go to Mr. Ludwick for advice or with questions, or to explain her actions; all conferences held between Mr. Ludwick and Mrs. Bertot were initiated by Mr. Ludwick. The underground newspaper was a point of discussion and concern among teachers and students; but all during this time that Mr. Ludwick was searching out the source and circumstances surrounding the newspaper, Mrs. Bertot did not come to Mr. Ludwick explaining the development of the newspaper and her role in it, although she was aware of Mr. Ludwick's concern and his efforts to learn the facts.

Example B

1. Mrs. Bertot showed a film to a group of sophomore students that she herself admits she feels was not appropriate for sophomore classes.

2. This film showing was done in the evening and was not in connection with a class project or assignment.

3. The principal and curriculum coordinator were available for the showing of such a film, but she waited until they had left before she showed it to the students without the knowledge of the principal or coordinator.

4. The next day she gave the film to a student to show. He took the film to another part of the building which resulted in a disturbance with another teacher.

II. *Insubordination or Undermining the School Principal*

Example

Mrs. Bertot's attitude and actions about the paper before and after the principal's statement of disapproval and the involvement of an additional non-school adult as outlined above hinged on the classification of insubordination.

III. *Immaturity*

Examples

She has the tendency to place herself on the same level with certain students, with the result that her effectiveness with the rest of the students is decreased.

She had done such things on occasion as greet all students with a peace sign as they enter her classroom.

Note: The above list of criticisms should be attached to the evaluation form of Mrs. Bertot, dated February 17, 1971, since there is no space on the form itself to provide for this. These criticisms were discussed verbally with Mrs. Bertot and have been discussed thoroughly with the Board.

/s/ Harvey S. Ludwick
Principal, Laramie High School

(In private conversation with Mr. Vern Newman, he has said that Mrs. Bertot exhibited a definite "immaturity in her judgment" while he was her principal at Laramie High School.)

Ludwick was "quite opposed" to the idea and indicated a high school student participating in it would jeopardize his career (Tr. 214). Dr. Ludwick testified that an underground newspaper is one not sponsored by the school, and which can and often does deteriorate and is used to defame the character of individuals, if necessary, to make a particular point (Tr. 124).

Mrs. Bertot advised the students of Dr. Ludwick's disapproval and told them she could not participate further. She said she gave them the facts and let them make their own decision (Tr. 214–215). The students discussed the problem and decided to go ahead with the newspaper.

Mrs. Bertot had discussed the project with a journalism student at the University of Wyoming and she introduced him to the students at the home of one student. However, after this meeting neither Mrs. Bertot nor the journalism student participated in the project. One issue of the newspaper entitled "Catharsis" was published shortly thereafter. It does not appear that it was distributed on school grounds (Tr. 224).

The paper is in our record. It is a poorly reproduced copy of a four page typewritten production with two drawings. One drawing is a political cartoon, and the other apparently an advertisement. The written material is divided into a group of several short articles on sexual equality, football, freedom of the press, and ecology—opposing a homecoming bonfire, espousing zero population growth and criticizing a local plant for pollution (R. 379–80).

Shortly after distribution of the paper the principal called Mrs. Bertot into his office and told her that her encouragement of the paper and arranging assistance of the journalism student had shown poor judgment (Tr. 129, 225). Dr. Ludwick testified that he saw nothing objectionable in the paper, but that he thought he should stop it. (Tr. 126). They disagreed on the issue, but Mrs. Bertot agreed to try to persuade the students to stop working on the paper. Dr. Ludwick made no reference then to not rehiring or punishing Mrs. Bertot, according to her testimony. There were no further editions of the paper.

The main details of the film incident are stated in the margin.[4] However, for reasons that follow we are satisfied that the primary focus should be on the circumstances surrounding the student newspaper, and the defendants' attention to them.

In deciding whether Mrs. Bertot may be entitled to judgment notwithstanding the verdict against her, the testimony of the principal, the superintendent, and the Board members is of primary significance. The recommendation to the Personnel Committee, its recommendation to the Board, and the Board's reasons for non-renewal of her contract are of critical importance in deciding whether the action adverse to her was for exercise of her constitutional rights. See *Smith v. Losee*, 485 F.2d 334, 338–340 (10th Cir.), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212.

As stated, Dr. Ludwick reduced to writing his reasons for recommending renewal of Mrs. Bertot's contract with

---

4. The film incident occurred in February, 1971. Mrs. Bertot had received some films she had requested from a private educational organization. Following an evening screening for Dr. Ludwick and other school personnel, she showed another film entitled "I Am a Man," which apparently dealt with black militancy, to two students. The next day one student asked if he could borrow the film to view during a free period privately. Instead he took it to another class and attempted to have the instructor show it, which he refused to do. During the next period the student again asked

the teacher to show the film and an argument ensued which Dr. Ludwick overheard.

Dr. Ludwick took the film, and together with Mrs. Bertot and the other teacher viewed the film himself. Dr. Ludwick objected to it on the grounds that it made the police look foolish and was inappropriate for sophomores. Dr. Ludwick testified it was inappropriate for the student to see the film, referring to the confusion that followed. He testified there was confusion and disruption in the classroom caused by the student having the film. (Tr. 157).

reservations. See note 3, supra. It states the reasons as lack of judgment, insubordination or undermining the principal, and immaturity. However, "Example A" commences with Mrs. Bertot's encouragement of development of a so-called underground newspaper. Her actions in connection with the paper are stressed through the four paragraphs of details under Example A. The showing of the film follows in discussing Example B. In supporting the charge of insubordination or undermining the principal, the theme again is Mrs. Bertot's attitude and actions about the paper, as the written statement reveals. Immaturity, charged on the basis of the peace sign, is last. The newspaper, however, predominates. And in his testimony in answering when he first realized he might have trouble with Mrs. Bertot, he turned to the occasion when he "talked to her about the underground newspaper situation. . . ." (Tr. 119).

The principal's testimony further reveals the basis for his views by the statement that an underground paper is one not sponsored by the school which can and often does "deteriorate" (Tr. 124). Nothing objectionable was noted in the paper when the one issue was seen. When asked during his testimony whether he felt he ought to stop it immediately, his reply was "Yes." (Tr. 126). He said his subsequent discussion with Mrs. Bertot brought a general agreement "that she would try to stop the paper" (Tr. 130).

When he testified about Mrs. Bertot's abilities, Dr. Ludwick said she was average to good as a teacher (Tr. 133). He referred to the reasons for his conclusions against her as poor judgment, insubordination and some immaturity. However, as in his written statement, his testimony returned repeatedly to the newspaper (Tr. 128–30).

The superintendent, Dr. Conklin, testified that the written statement contained the significant reasons presented by the principal for his recommendations, and these were the reasons relied on by Dr. Conklin in supporting his rec-

ommendation (Tr. 66). He referred repeatedly to Mrs. Bertot's actions in connection with the newspaper, classing it, however, as her "lack of judgment" (Tr. 63–64), or failure to follow Board policy (Tr. 74–75). He did refer also to other matters such as absenting herself from the classroom.

The testimony of the board members followed the same pattern. Mr. Chasteen, Chairman of the Board and a member of the Personnel Committee, testified that they did not go beyond the recommendation of Dr. Ludwick in their evaluation of Mrs. Bertot (Tr. 186). He said Dr. Ludwick was asked about his reservations and enumerated them as pointed out in the written statement (Tr. 186). Development· of the newspaper was viewed by Chairman Chasteen as controversial and he referred to Dr. Ludwick not wanting an additional publication beyond the school paper and a teenage page in the local paper (Tr. 504–05).

Similarly, the testimony of other board members referred to Mrs. Bertot's actions in connection with the newspaper as the basis for the "poor judgment" reason for non-renewal, along with the film incident (Tr. 368–69, 399, 409–10, 439–40). Mr. McNamee testified that "[t]he concern of the Board was the fact that underground newspapers tend to degenerate." (Tr. 405).

In sum, while references to the film incident, the peace sign and other points were made, the predominant emphasis was on the specific actions of Mrs. Bertot in connection with the newspaper. Although there was no Board policy against such a publication (Tr. 406), it is clear that Dr. Ludwick reacted to the one edition immediately by attempting to stop the publication. From the testimony of the principal, the superintendent and the board members, it is an inescapable conclusion from examining this record that Mrs. Bertot's action connected with the student newspaper were the paramount and recurring reason for non-renewal of her contract. While the reasons were stated as poor judgment, in-

subordination, failure to follow Board policy, and circumvention of the principal, the underpinning throughout was primarily Mrs. Bertot's acts in connection with the newspaper.

### First Amendment principles

█ As recognized above, a discharge for exercise of such First Amendment rights is impermissible. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811; *Adams v. Campbell County School District,* 511 F.2d 1242, 1246 (10th Cir.). Having concluded that the record evidence established beyond dispute that the predominant reason for Mrs. Bertot's non-renewal was her activities with the newspaper publication, it remains to determine whether her acts were within the protection of the Amendment.

█ It seems clear that activities connected with the newspaper publication could not be more eligible for protection of the constitutional guarantee. See *Papish v. University of Missouri Curators,* 410 U.S. 667, 93 S.Ct. 1197; 35 L.Ed.2d 618; *Pickering v. Board of Education,* supra. In fact, the trial court charged the jury that Mrs. Bertot's activities relating to the newspaper were constitutionally protected so long as they did not lead to a material or substantial disruption of class work, or did not involve substantial disorder or invasion of the rights of others (Tr. 938). Moreover her acts of assistance and association with the publication are protected, although no writing of her own was involved. *Pickings v. Bruce,* 430 F.2d 595, 598–99 (8th Cir.), and see *Papish v. University of Missouri Curators,* supra; *Rampey v. Allen,* 501 F.2d 1090, 1097 (10th Cir.), cert. denied, 420 U.S. 908, 95 S.Ct. 827, 42 L.Ed.2d 838. The *Pickings* case in fact involved sanctions imposed for refusal of faculty advisors to withdraw an invitation to outside speakers.

Such sanctions against particular student publications are unlawful under the First Amendment. See *Scoville v. Board of Education of Joliet Township et al.,* 425 F.2d 10 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55; *Shanley v. Northeast Independent School District,* 462 F.2d 960 (5th Cir.); *Joyner v. Whiting,* 477 F.2d 456 (4th Cir.). The *Scoville* case involved a similar high school publication written off the premises and distributed in the school. The complaint of students that their expulsion for such activities was unlawful was held to state a valid constitutional claim.

Moreover, the balancing of interests required under *Pickering v. Board of Education,* supra, does not seem difficult to us in this case. The State has valid interests as an employer in regulating speech of its employees that differ significantly from those it possesses in connection with regulation of speech in general. However, our record contains no showing whatever that the actions in question impeded Mrs. Bertot's proper performance of her classroom duties or interfered with the regular operation of the school generally. *Pickering,* supra at 572–73, 88 S.Ct. 1731.

█ The assertions that she undermined the principal's authority or was insubordinate cannot be accepted. For the only premise for a valid claim of insubordination is that the school could properly ban such publications in advance. While reasonable regulations of activities on school property or of distribution of a publication thereon might be made, compare *Fujishima v. Board of Education,* 460 F.2d 1355 (7th Cir.) with *Eisner v. Stamford Board of Education,* 440 F.2d 803 (2d Cir.), the policy involved here was one to ban such publications—a policy plainly impermissible under the Amendment. The claimed justification that such publications tend to "degenerate" is clearly inadequate, being no more than an undifferentiated fear, which cannot serve to infringe free speech rights. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731. The Amendment tolerates absolutely no prior restraints predicated on surmise or conjecture that untoward consequences may result. See *New York Times Co. v. United States,* 403 U.S. 713,

725–26, 91 S.Ct. 2140, 29 L.Ed.2d 822 (Brennan, J., concurring).

 We are satisfied that under First Amendment principles Mrs. Bertot's activities were constitutionally protected and that she could not be penalized for exercising them. Therefore she is entitled to judgment, notwithstanding the verdict, adjudging that the non-renewal of her employment was unlawful, and appropriate relief redressing the constitutional wrong.

### Remedies and liabilities of the defendants

In view of our conclusion that the non-renewal must be held unlawful notwithstanding the verdict, equitable and declaratory relief should be granted on remand, despite the immunities claimed by the defendants. See *William v. Eaton,* 443 F.2d 422, 428–29 (10th Cir.). However, the claim for money damages, including back pay, brings us to the various immunities.

 As stated earlier, the defendants were sued in their official and individual capacities. As individuals, they have a qualified immunity from damages based on the exercise of good faith. See *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214; *Smith v. Losee,* 485 F.2d 334 (10th Cir.). The special interrogatories submitted the good faith immunity defense. The first interrogatory asked whether the defendant District and Trustees acted "in good faith in failing to renew the teaching contract of Donna Bertot for the school year 1971–72." (Tr. 942). The second interrogatory asked whether the defendants acted "maliciously and for purpose of retaliation in failing to renew the teaching contract. . . ." Both interrogatories were answered in favor of the defendants, and the general verdict was rendered in their favor.

While objections were made to the wording of the interrogatories at trial, none is urged on appeal. Thus we have the case in the posture that the immunity defense has been submitted and decided for the defendants, and our question is whether the plaintiff, Mrs. Bertot, is entitled to judgment on her claim for money damages, including back pay, notwithstanding the jury verdict and findings against her.

 The recent decision in *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214, has defined the immunity defense in the specific context of school discipline. Due to the similarity of the discretionary authority exercised by local school officials in student discipline and teacher employment matters, we feel the immunity test there stated should apply in a case like this. See *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396. The Court stated at 420 U.S. at 322, 95 S.Ct. at 1001:

> Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are "charged with predicting the future course of constitutional law." *Pierson v. Ray,* supra, 386 U.S., at 557, 87 S.Ct., at 1219. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

 While we are satisfied that the paramount reason for the non-renewal was the impermissible consideration of Mrs. Bertot's activities in connection with the paper, we cannot hold that it was beyond reason to find that the non-renewal was in good faith. Under the *Wood* test for the immunity, the record

does not impel the conclusion that the defendants acted with a malicious intention to cause a deprivation of constitutional rights or other injury. Further, at the time of the 1971 non-renewal of Mrs. Bertot's contract, *Roth* and *Sindermann* had not been decided and our controlling decision was *Jones v. Hopper,* 410 F.2d 1323 (10th Cir. 1969), cert. denied, 397 U.S. 991, 90 S.Ct. 1111, 25 L.Ed.2d 399 (1970). There a similar constitutional claim of unlawful termination of an untenured instructor's employment because, inter alia, of founding an independent faculty-student publication was rejected for failure to state a claim. *Id.* at 1328–29. Hence, we cannot say that the defendants knew or reasonably should have known that their actions would violate constitutional rights. *Wood v. Strickland,* supra, 420 U.S. at 322, 95 S.Ct. 992, 43 L.Ed.2d 214. Under these circumstances we feel the verdict and finding on the good faith immunity should not be disturbed as to the individual defendants, in their individual capacities.

There remain the claims of Mrs. Bertot against the School District itself, and the individual defendants in their official capacities. Under Wyoming law the District is a corporate entity which may sue and be sued through the Board. See §§ 21.1–17 and 21.1–27, Wyoming Statutes Annotated (Cum.Supp.1973). The District, with the other defendants, pleaded several immunities—government immunity, immunity from damage judgments at common law and sovereign immunity (R. 254, 255, 257).

With respect to the good faith immunity, its rationale, as expressed in *Smith*

*v. Losee,* supra at 340–44, is to permit individuals holding various offices to exercise their duties free from fear of damage suits, by affording them a qualified privilege. Whether such a privilege applies to the corporate entity and the individual defendants in their official capacities is a different question on which there are differences of view.[5] The trial court has not expressed its view on the issue,[6] and it was not briefed or argued to us. We feel it proper to remand the issue to the trial court.

We also feel the immunities pleaded were sufficient to raise the Eleventh Amendment defense. In any event its bar is jurisdictional and must be noticed, *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, since it might apply to the District and the individual defendants in their official capacities, if they are found to be an alter ego of the State.[7] Further, it is not clear whether the district is a "person" suable under 42 U.S.C.A. § 1983.[8] These questions involve consideration of Wyoming law and local circumstances, as well as federal law, and we feel we should also remand them.

The trial court should determine such of these immunity questions as are necessary to decide if the district and the individual defendants in their official capacities are subject to liability, and if so, further proceedings should be had for entry of the proper judgment.

Accordingly, the judgment is affirmed as to Mrs. Sweeney's case. As to Mrs. Bertot, the judgment is affirmed as to denial of relief on the procedural due

---

5. *Compare Carter v. Carlson,* 144 U.S.App. D.C. 388, 447 F.2d 358, 367 & n. 27, rev'd on other grounds sub nom. *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613; *Lipman v. Brisbane Elementary School District,* 55 Cal.2d 224, 11 Cal.Rptr. 97, 359 P.2d 465, 467; Davis, Administrative Law Treatise § 25.17, at 864–65 (Supp.1970); *with* Jaffe, "Suits Against Governments and Officers: Damage Actions," 77 Harv.L.Rev. 209, 213 & n. 13 (1963).

6. As stated, the judgment was entered on a general verdict and the answers to two interrogatories and there was no expression by the

Court as to the basis on which the disposition rests.

7. See *Harris v. Tooele County School District,* 471 F.2d 218 (10th Cir.); *Kansas Turnpike Authority v. Abramson,* 275 F.2d 711 (10th Cir.), cert. denied, 363 U.S. 813, 80 S.Ct. 1250, 4 L.Ed.2d 1154; *George R. Whitten, Jr., Inc. v. State University Construction Fund,* 493 F.2d 177 (1st Cir.).

8. See *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596; *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109; *Campbell v. Masur,* 486 F.2d 554 (5th Cir.).

process claim and as to the denial of damages against the individual defendants, in their individual capacities. The judgment is otherwise vacated and the case is remanded for further proceedings in accord with this opinion.