David **BUTLER** and Leon Willis, Plaintiffs-Appellants,

v.

Frederick Hugh **HAMILTON** as Director of the Black Education Program at the University of Colorado, and James Corbridge as Vice President in charge of Minority Affairs at the University of Colorado, Defendants-Appellees.

No. 75–1492.

United States Court of Appeals, Tenth Circuit.

Submitted March 23, 1976.

Decided Oct. 19, 1976.

---

Anthony F. Renzo and Jon B. Clarke, Denver, Colo., for plaintiffs-appellants.

Richard A. Tharp, Asst. Atty. Gen., Boulder, Colo., for defendants-appellees.

Before LEWIS, Chief Judge, SETH, Circuit Judge, and MORRIS *, District Judge.

LEWIS, Chief Judge.

Appellants Butler and Willis brought this action under 42 U.S.C. § 1983 alleging their first and fourteenth amendment rights were violated when their employment was terminated because of a press conference they held. The action was tried to the district court of the District of Colorado which found that the press conference was not the motivating cause of appellants' discharge and entered judgment for defendants Hamilton and Corbridge. For the reasons hereinafter stated, we hold that the district court's finding is not clearly erroneous and affirm the judgment.

Butler and Willis were staff counselors in the Black Education Program (BEP) at the University of Colorado when defendant Hamilton was hired as a new program director. Hamilton's attempts to change the direction and orientation of BEP created a conflict between himself and BEP's exist-

---

* Joseph W. Morris, Chief Judge, United States District Court, sitting by designation.

ing staff members. Butler, Willis, and Karen Lane, the third staff counselor, were openly critical of Hamilton's direction of the program.

In February 1973, Hamilton hired LaNell Rhone to be his assistant director and to supervise the three staff counselors. With Hamilton's approval, Rhone decided the counselors should submit to her counseling data forms of the students they counseled. Willis, Butler, and Lane returned respectively only 40 percent, 15 percent and 0 percent of these required forms. The trial court found that the relationships between Hamilton and Rhone on the one side and the three counselors on the other deteriorated rapidly into a situation of almost open warfare.

In March, Lane obtained several documents concerning the use of BEP funds which she believed indicated Hamilton was engaging in improper expenditures. The three counselors took this information to Hamilton's superior, defendant Corbridge, who was the vice president for minority affairs. Corbridge arranged a meeting for March 23, 1973, with Hamilton, the three counselors, and himself. At the beginning of the meeting, Willis demanded Hamilton's resignation. Hamilton explained some of the questioned expenditures before walking out of the meeting. The counselors asked Corbridge to conduct an audit. Corbridge later met with Hamilton and concluded no audit was necessary. On March 30, 1973, Hamilton submitted his letter of resignation.

In early April a meeting was held at which the three counselors discussed Hamilton's alleged misuse of BEP funds with 60 to 70 BEP students. Although invited to attend, Hamilton was not present at the meeting. During this same period Rhone met with Corbridge to discuss the conflict within BEP and her strained relationships with the three counselors.

On Friday, April 13, 1973, Hamilton wrote a memorandum to Corbridge notifying him the counselors were delinquent in submitting their reports. On the same day, Rhone sent a memorandum to the counselors informing them their counseling forms were overdue. Hamilton asked to withdraw his resignation and Corbridge accepted the withdrawal.

Also on this Friday, the counselors decided to hold a press conference on the following Monday. The decision came after the counselors sought the advice of the prominent civil rights attorney, Flo Kennedy, who suggested a press conference to bring pressure on the University administration to conduct an audit of BEP expenditures. Willis called the University Memorial Center to reserve a room on Monday, April 16, for the press conference. The UMC is available only for official University functions and cannot be used for private press conferences. Since the person in charge of UMC scheduling knew Willis was a BEP counselor, the reservation was granted on the belief it was an official BEP press conference. Butler notified Corbridge's office of the planned press conference on this same Friday.

On Monday morning, April 16, 1973, Corbridge contacted Hamilton and told him about the planned press conference. Hamilton called a staff meeting and informed the counselors he had withdrawn his resignation. Hamilton also asked about the planned press conference, ordered them not to hold it, and told them the press conference would be considered an act of insubordination and would be dealt with accordingly if held.

When the counselors declared their intention to hold the press conference, Hamilton went to Corbridge's office to inform him the counselors had to be discharged. Hamilton drafted the termination letters in the legal counsel's office which stated the appellants were being discharged because of a failure to submit the counseling data forms and because of a pattern of insubordination culminating with their refusal to obey a directive not to hold the press conference.

Meanwhile, appellants held the press conference during their lunch hour at the University Memorial Center. Lane decided not to participate in the press conference after receiving Hamilton's order not to hold it.

After the press conference all three counselors were given their letters of termination.

Within a few days, Lane asked Corbridge to reconsider her termination. She was subsequently rehired and assigned to another department of the University. Willis and Butler, who could be dismissed only for just cause, pursued a grievance procedure but the University's president affirmed their dismissals on the basis of unsatisfactory performance.

Appellants brought a 42 U.S.C. § 1983 suit seeking damages and reinstatement. The case was tried to the court which found "the holding of the press conference by the two plaintiffs was not the motivating cause of plaintiffs' discharge." The trial court also based its judgment for the defendants on two other alternative grounds: (1) the plaintiffs' speech at the press conference is not protected by the first amendment and (2) the defendants are entitled to an official privilege and immunity from the assessment of damages. Because of our disposition of the first basis of the trial court's judgment, we do not review the last two grounds in affirming the trial court's judgment.

■ This court will not disturb a finding of fact by a district court unless clearly erroneous. The burden of demonstrating that findings are clearly erroneous is a heavy one and appellants must point out specifically where the findings of the trial court are clearly erroneous. *Pachmayr Gun Works, Inc. v. Olin Mathieson Chem. Corp.,* 9 Cir., 502 F.2d 802.

Appellants specifically point to eight facts which they contend were established at trial to support their assertion that the trial court's finding is clearly erroneous: (1) Hamilton never mentioned dismissing appellants until he learned of their planned press conference; (2) Hamilton told other University employees that appellants were being terminated for refusing to obey his order not to hold the press conference; (3) Hamilton ordered appellants not to hold the press conference and if they did so it would be considered an act of insubordination; (4) the dismissal letters said the "insubordinate and irresponsible act" of holding the press conference necessitated appellants' terminations; (5) Hamilton said under oath three weeks after the dismissals that the press conference was the specific incident leading to appellants' terminations; (6) a written unemployment report based upon Hamilton's statements said Willis was fired for refusing to obey Hamilton's order not to hold the press conference; (7) Hamilton made the decision to dismiss appellants the same morning he learned of their planned press conference; and (8) the only counselor who did not participate in the news conference was reinstated the next day.

Defendants opine that the two primary causes for appellants' dismissals are: (1) failure to submit the counseling forms and monthly records and (2) failure to render to Hamilton and Rhone the kind of support and cooperation necessary for the effective functioning of BEP.

■ Having perused the evidence in this case we affirm the trial court's evidentiary finding that the press conference was not the motivating factor in the dismissals. The strained relationships, continuing disputes, repeated allegations, precipitous calls for resignation, and failures to file reports or keep counseling forms were all factors in determining appellants would not cooperate with Hamilton to run an effective program. Appellants would cover this obvious fact with a veil of freedom of speech. The veil is far too diaphanous to conceal reality. Appellants were deprived of no constitutional rights. As private citizens they were entitled to express their views within the law on any subject of their choosing. Appellants' right to freedom of speech, however, did not preclude Hamilton from concluding on the basis of their past conduct that they were unable or unwilling to perform their duties in a manner most beneficial to the students.

■ Defendants believed appellants were unwilling to work with and cooperate with Hamilton and Rhone for the benefit of BEP, and there is no reason to find defend-

ants' beliefs were conceived in other than good faith. Such honestly held feelings of antagonism would hardly promote the efficiency and harmony of BEP. Disharmony within a small organization could severely disrupt the smooth functioning of this critical organization for the education of black students and divide its members into separate camps. While the courts must scrupulously protect public employees against incursions upon their first amendment freedoms and vigilantly ferret out government attempts to mask constitutionally impermissible discharges behind the cloak of disharmony and inefficiency, we find no such unconstitutional intrusion or deception present in the instant case. The personal antipathy existing between appellants on the one side and Hamilton and Rhone on the other was clearly not imaginary and the holding of the press conference, although a protected private right, was accompanied by an unjustified cloak of officialdom about which Hamilton could properly complain.[1]

The exercise of a constitutionally protected right by a public employee does not serve as a curative for all prior misconduct during the course of employment. A public employee cannot expunge all prior transgressions from his employment record by merely exercising a constitutional right. A discharge for exercise of first amendment rights is impermissible. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811; *Bertot v. School Dist. No. 1*, 10 Cir., 522 F.2d 1171, 1183. The exercise of a first amendment right, however, does not insulate a public employee from being discharged for occurrences prior to the exercise of the right. Furthermore, the exercise of a constitutional right does not provide a grace period for a public employee immunizing him from a discharge immediately following such exercise, as long as the exercise of the right did not motivate the dismissal.

We hold that the district court's finding that the holding of the press conference was not the motivating cause of appellants' dismissal is not clearly erroneous.

Affirmed.

1. The trial court found that although the University Memorial Center is not available for private press conferences, Willis did not make an express misrepresentation when he reserved a room for the press conference.