710 F.2d 669
 Fed. Sec. L. Rep. P 99,244
Kelly J. CHRISTY, Hunt Klein, Richard J. Loose and Pearse E.
Nolan, Plaintiffs- Appellants, Cross-Appellees,
v.
Mark C. CAMBRON, Defendant-Appellee,
and
Ernest W. Crates, Jr.,
Defendant-Counterclaimant-Cross-Claimant-Appellee-
Cross- Appellant.
 Nos. 81-1927, 81-1951.
 United States Court of Appeals,
Tenth Circuit.
 June 17, 1983.
Rehearing Denied July 21, 1983.
 
 James H. Chalat, Kritzer & Chalat, Denver, Colo. (Karen J. Mathis, Denver, Colo., with him on brief), for plaintiffs-appellants, cross-appellees.
 Roger P. Thomasch, Roath & Brega, Denver, Colo., for defendant-appellee.
 Alan H. Bucholtz, Quiat, Bucholtz, Bull & Laff, P.C., Denver, Colo., for defendant-counterclaimant-cross-claimant-appellee-cross-appellant.
 Before DOYLE, BREITENSTEIN and McKAY, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The plaintiffs-appellants are Kelly Christy, Hunt Klein, Richard Loose and Pearse Nolan. Their action was brought in the United States District Court for the District of Colorado. The allegation in the complaint was that Cambron had violated Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. Sec. 240.10b-5 (1982) and Section 12(2) of the Securities Act of 1933, 15 U.S.C. Sec. 77l (1976). A further allegation was that Cambron had breached his fiduciary responsibilities as an incorporator under Colorado law.
 
 
 2
 Plaintiffs contended, with respect to Crates, that he had violated several securities regulations and laws. He counterclaimed against the plaintiffs, asserting fraud in the sale to him of the stock in Mark Cambron, Inc., the name of the corporation here in question. Crates also alleged violations of securities laws and regulations. Crates brought similar crossclaims against Cambron. A third-party claim by Crates against Trevor T. Bradway Company was settled prior to trial.
 
 
 3
 The case was tried to a jury which returned a verdict for the plaintiffs and against Cambron on all three claims for relief. The jury awarded compensatory damages of $6,000 to Christy, $11,000 to Klein, $16,000 to Loose, and $17,000 to Nolan. The plaintiffs shared an award of $23,000 in punitive damages assessed against Cambron. Crates obtained verdicts against all of the plaintiffs and Cambron. He was awarded $3,000 from each of the plaintiffs, and $5,500 from Cambron.
 
 
 4
 Cambron filed a motion for either a new trial or a judgment notwithstanding the verdict. The plaintiffs made similar motions. Crates moved for a new trial on the issue of damages.
 
 
 5
 Before the motions were passed upon by the trial court, discovery was made through hearsay information that the jury had obtained legal reference materials from the Denver Public Library, an act which is misconduct, since the jury is required to be persuaded by that which goes on in the courtroom only.
 
 
 6
 The misconduct just mentioned was not the subject of the granting of any relief by the trial court. The court did expressly grant Cambron's earlier raised motion for a judgment notwithstanding the verdict. Finally the judge dismissed the case in its entirety.
 
 
 7
 This case revolves around a discotheque in Vail, Colorado. The incidents came about in the winter of 1975-76. Mark Cambron was the organizer of a corporation which undertook to build a discotheque in Vail. He placed advertisements in The Wall Street Journal and The Denver Post. Plaintiffs responded to these ads and purchased interests in Cambron's business. Cambron sought about $90,000 in capitalization, and he received the following: $40,000 from Mr. Davis (but his money was returned to him when he withdrew); $15,600 from plaintiff Christy; $20,000 from plaintiff Klein; $30,000 from plaintiff Loose, and $31,560 from plaintiff Nolan. The total obtained was $97,160.
 
 
 8
 Prior to the opening of the business, Cambron diverted some $40,000 of the start-up capital to his personal use. He does not deny that he obtained this money, but he said he was entitled to it pursuant to pre-incorporation agreements signed by each plaintiff. These agreements provided that plaintiffs consented that any money left in the disco start-up fund after readying the disco for operation would be paid to Cambron as compensation. Should the start-up fund have proven insufficient to prepare the disco for business, Cambron was required to meet the additional expenses out of his own pocket. The preparation of the disco for opening cost about $50,000. Thus, Cambron was able to take the remainder of the start-up fund, about $40,000, as compensation.
 
 
 9
 The reason for the low start-up cost of the disco was that the equipment was, for the most part, leased. The plaintiffs claim that Cambron had agreed to purchase all of the disco's equipment, but evidence introduced at the trial showed the plaintiffs knew of, and in one case suggested, the leasing of the disco's equipment.
 
 
 10
 The business was called "Mark Cambron, Inc.," and it was formed to own the disco. Each plaintiff received shares commensurate with the percentage of his capital contribution.
 
 
 11
 Each plaintiff was an officer and director of the corporation. Plaintiffs were involved in running the disco during its brief lifespan, the 1976 ski season.
 
 
 12
 Although the parties hoped to open the disco in time for Christmas, 1975, the opening was put off until early February, 1976 because of delays in construction of the shopping center where the disco was located.
 
 
 13
 There were also other problems. First, the snowfall in 1976 was poor, as a result of which there were few skiers in Vail, and hence, few customers at the disco. Second, the Vail gondola disaster frightened skiers away from Vail. Third, plaintiff Klein fired a group of employees of the disco, who were local Vail residents. These employees vowed that they would keep local customers, an important source of revenue, away from the disco.
 
 
 14
 The disco closed in April, 1976. Shortly after the disco closed, it was sold to a Mr. Axelrod for $180,000. Subsequently he defaulted on his payments, and Cambron and the plaintiffs repossessed the disco.
 
 
 15
 The disco was once again put on the market for sale by way of a listing with the Trevor T. Bradway Company. Ernest Crates learned of the listing when Mr. Gamblin, an agent of Bradway, told him that the disco was for sale and that there were several interested buyers. Crates agreed to purchase the disco with the hope that he could immediately resell it for a profit. There was a dearth of buyers, however, and this was also due to the economic conditions at Vail at that time. So Crates was forced to operate the disco during the 1976-1977 ski season. His claim was that he lost his original investment plus substantial additional money in this endeavor.
 
 
 16
 The main contention on this appeal is that the trial court erred in granting a motion for a judgment notwithstanding the verdict. Hence, we examine the rules which pertain to the granting of this sort of relief.
 
 
 17
 The trial court, passing upon a motion for a judgment notwithstanding the verdict, examines the evidence in a light most favorable to the plaintiff. Judgment notwithstanding the verdict may not be granted unless the evidence is susceptible of no reasonable inferences that sustain the position of the party against whom the motion is made with respect to one or more of the necessary elements of each claim for relief. Barnett v. Life Insurance Company of the Southwest, 562 F.2d 15, 17 (10th Cir.1977); Bertot v. School Dist. No. 1, 522 F.2d 1171, 1178 (1st Cir.1975).
 
 
 18
 The reasons given by the trial court in support of its ruling granting a judgment notwithstanding the verdict were that the plaintiffs had not proven a good many of the elements essential to this kind of a law suit: (1) the dispute did not involve a "security" within the meaning of the securities laws; (2) there was no causal relationship between the plaintiffs' losses and any misrepresentations or omission by Cambron; and (3) Crates' claims were not supported by the evidence.
 
 
 19
 The District Court Did Not Err in Granting Cambron's Motion
 
 
 20
 It is clear that plaintiffs' shares in the disco were not "securities" within the meaning of the federal securities law. The attribute of a security is that it represents an investment in a venture which derives profits from the entrepreneurial or managerial efforts of others. United States Housing Fund, Inc. v. Forman, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) (emphasis added). See Securities and Exchange Commission v. Howey, 328 U.S. 293, 298-99, 66 S.Ct. 1100, 1102-03, 90 L.Ed. 1244 (1946). The economic realities of the case at bar show that plaintiffs were buying a discotheque, and there is no question about that. See Chandler v. Kew, Inc., 691 F.2d 443, 444 (10th Cir.1977). Plaintiffs were actively involved in operating and managing the disco. Their shares in Mark Cambron, Inc. were not, therefore, incidents of an investment which derived profits from the efforts of others.[1] The same is true with respect to Crates, who subsequently purchased the disco. Thus, the trial court properly granted judgment notwithstanding the verdict as to all the federal securities claims.
 
 
 21
 We turn now to the question of whether the trial court erred in dismissing plaintiffs' and Crates' breach of fiduciary duty claims.[2] Under Colorado law, corporate directors and promoters are fiduciaries and are liable for " 'losses of the corporation caused by their bad faith or willful and intentional departure from duty, their fraudulent breaches of trust, their gross or willful negligence, or their ultra vires acts.' " Holland v. American Founders Life Ins. Co., 151 Colo. 69, 376 P.2d 162, 165 (Colo.1962) (quoting 19 C.J.S. Corporations, Sec. 764, p. 114) (emphasis added). See Bowers v. Rio Grande Investment Co., 163 Colo. 363, 431 P.2d 478, 480 (Colo.1967); Swafford v. Berry, 152 Colo. 493, 382 P.2d 999, 1001-02 (Colo.1963).
 
 
 22
 The entire enterprise was, to say the least, depressing and sad. Furthermore, the losses were not wholly attributable to Cambron's misdeeds. He fulfilled his obligation to plaintiffs by providing them with an operational business, and basically that is what they were buying. To be sure, there was insufficient capitalization to sustain the business, but this was partly the fault of the plaintiffs; they should never have consented to Cambron's taking into his own use whatever remained of the working capital. In other words, the plaintiffs consented to a start-up sum of zero in the agreements they signed before incorporation. But, nevertheless, this lack of capital is largely the reason for the collapse of the venture. And added to the lack of capital was the delay in construction, which forced the disco to open after the Christmas season, and the snowfall was poor in that year, 1976. Moreover, the Vail gondola accident occurred that year, and this affected the number of patrons. One other factor which is said to have had some influence was that one of the plaintiffs fired a group of the disco's employees; and a sale of the disco to one buyer for $180,000 fell through when that buyer defaulted.
 
 
 23
 Plaintiffs maintain that Cambron had undertaken to purchase the disco's equipment, rather than to lease it. They had the opportunity, certainly, to insist that he use the surplus capital for that purpose. However, they impliedly consented to that feature. First, plaintiff Loose knew of Cambron's intention to lease the equipment before he signed his pre-incorporation agreement. Second, Nolan suggested to Cambron that he lease rather than purchase. Third, each of the plaintiffs signed a personal guarantee of the lease. Finally, at a meeting held on June 23, 1976, Cambron agreed to non-payment of a $2,500 loan he had made to the disco in return for plaintiffs' agreement to foreswear their objections to the decision to lease. All of these facts point to the conclusion that plaintiffs knew of and acquiesced in Cambron's conduct, including his decision to lease the equipment. Hence, the plaintiffs cannot justify the complaint at this late date. Swafford, supra, 382 P.2d at 1002.
 
 
 24
 The claim of Crates against plaintiffs and Cambron was also dismissed by the trial court and we must hold that that was appropriate. Crates admitted during his direct testimony that Cambron had informed him that the disco was a failure. Therefore, Crates knew he was taking a risk when he purchased the disco. Moreover, any loss suffered by Crates was attributable to a realty agent for the Trevor T. Bradway Company. That agent told Crates that he could immediately resell the disco to a buyer who was just around the corner. There was no such buyer, and so this, then, was the fault of the agent, and not plaintiffs or Cambron.
 
 
 25
 All in all, the entire venture was a dismal one. Although it promises to be something in the nature of a fraud, it fails to so develop, what with all of the knowledge on the part of the plaintiffs, the implied consents that are also present, and in view, also, of the fact that the season was a poor one from a business standpoint.
 
 
 26
 It is our conclusion, in view of all the facts which we have discussed at some length, that there is no reason to reach the question of jury misconduct. We conclude, also, that the judgment of the district court is hereby affirmed.
 
 
 
 [1]
 Plaintiffs owned about 81 percent of the discotheque. But the approach used here is not a matter of numbers. As stated by the Eleventh Circuit, "[a] sale of less than 100% of the stock might not be covered by the [Securities] Acts. A sale of 100% of the stock can be covered by the Acts." King v. Winkler, 673 F.2d 342, 346 (11th Cir.1982). In other words, the issue is not a matter of numbers, but, rather, whether the purchaser of securities expects to profit from the efforts of others
 
 
 [2]
 Dismissal of plaintiffs' federal securities claims does not deprive this court of jurisdiction to decide their pendent state claim. Considerations of judicial economy, convenience and fairness to litigants permit this court to exercise jurisdiction over pendent state claims arising out of the same nucleus of operative facts as federal claims which are found wanting. Rosado v. Wyman, 397 U.S. 397, 404-05, 90 S.Ct. 1207, 1213, 25 L.Ed.2d 442 (1970). See Hudak v. Economic Research Analysts, Inc., 499 F.2d 996, 1001 (5th Cir.1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975)