H. Bruce FRANKLIN, Plaintiff,

v.

Dale M. ATKINS et al., Defendants.

Civ. A. No. 74-A-777.

United States District Court,
D. Colorado.

Feb. 11, 1976.

440

The American Civil Liberties Union Foundation of Colorado by Anthony F. Renzo, Louis A. Bluestein, Denver, Colo., and Robert C. Leher, Littleton, Colo., for plaintiff.

Richard A. Tharp, Asst. University Counsel and George D. Dikeou, Asst. University Counsel, University of Colorado, Boulder, Colo., for defendants.

## MEMORANDUM OPINION

ARRAJ, Chief Judge.

On December 3, 1973, Plaintiff H. Bruce Franklin made application for one of two available faculty positions in the English Department at the University of Colorado. Although his application was one of several hundred submitted, the English faculty approved his appointment in January, 1974, by the "overwhelming" vote of twenty-six to five (one abstention). Pursuant to subsequent independent investigations and interviews, plaintiff's appointment also received the approval of the Dean of the College of Arts and Sciences, Mr. William E. Briggs, the then Vice-President of University Affairs and Provost, Mr. Lawson Crowe, and the President of the University at that time, Dr. Frederick Thieme.

At the regular meeting of the Board of Regents of the University of Colorado on April 25, 1974, Dr. Thieme presented plaintiff's application for consideration with his recommendation. However, the Regents voted eight to one against approval. On June 25, 1974, at another regularly scheduled meeting of the Board, the same Regents voted to refuse to reconsider the earlier vote. The eight individual Regents voting against plaintiff on each occasion are the named defendants.

Plaintiff brings this action under 42 U.S.C. § 1983, seeking injunctive relief and damages against each defendant, and, pursuant to Rule 57, Fed.R.Civ.P., a declaratory judgment. Injunctive and declaratory relief are also sought for the alleged violation of the University's own regulations by the defendants, and we have previously determined that the Court will consider this pendent claim. Jurisdiction, claimed to exist by virtue of 28 U.S.C. §§ 1343, 2201, and 2202, is apparently conceded.

It is plaintiff's claim that each defendant's decision was based primarily, if not solely, on Professor Franklin's belief in Marxism, his advocacy of that political belief and philosophy in his speeches and writings, and his participation in various political movements, groups, and demonstrations, thus abridging his First Amendment rights to free speech and association, as well as violating University regulations. Defendants respond that the decision not to hire Mr. Franklin was a valid exercise of the discretion vested in them, and involved a determination that the hiring of plaintiff was not in the best interests of the University of Colorado. Trial was to the Court, and this opinion shall constitute our findings of facts and conclusions of law.

Before turning to a consideration of the issues involved in the resolution of the present matter, it is necessary to point out what is *not* at issue. Only one of the defendants entertained any doubt as to the outstanding academic qualifications of Professor Franklin, and all agreed that his scholarly achievements and teaching abilities were not an issue. He was described· in letters of recommendation as one of the outstanding scholars in American Literature, perhaps the most accomplished at his age, and as a teacher of ease and confidence, as well as wit, who knows his subject thoroughly, and how to get it across. Nor is there any evidence that Professor Franklin ever improperly used his classroom as a forum for the advocacy of his political views.

The Board of Regents, however, were not limited in their consideration of Franklin's application to his academic qualifications and teaching abilities alone. There is

> no requirement in the Federal Constitution that a teacher's classroom conduct be the sole basis for determining his fitness. Fitness for teaching depends on a broad range of factors. *Shelton v. Tucker*, 364 U.S. 479, 485, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Beilan v. Board of Education*, 357 U.S. 399, 406, 78 S.Ct. 1317, 1322, 2 L.Ed.2d 1414 (1958).

This is particularly true in the case of a potential applicant, rather than that of a present employee seeking to continue in his position. The state's interest in ob-

taining even marginally relevant information about an applicant is greater because of the lack of other, more direct information from his conduct as an employee. Developments in the Law, *Academic Freedom*, 81 Harv.L.Rev. 1045, 1075 (1968).

■ This is not to say that the determination may be placed on *any* basis. The Regents may decline to hire a professor for a good reason or, perhaps, no reason. But it may not do so for a bad reason if that reason is one's lawful exercise of constitutionally protected rights. *Shumate v. Board of Education of County of Jackson*, 478 F.2d 233, 234 (4th Cir. 1973); *Weathers v. West Yuma County School District R–J–1*, 387 F.Supp. 552, 561 (D.Colo.1974). This would allow the government to produce a result indirectly which it could not command directly. *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2513, 33 L.Ed.2d 570 (1972). Thus, while the interest of an applicant in obtaining a position may be less compelling than that of an employee in retaining his position, Developments in the Law, *Academic Freedom*, *supra*, we pointed out in our previous opinion in this matter that the indirect abridgment described in *Sindermann* would nevertheless be present where the application is denied because of the exercise of the constitutionally protected interests in free speech and association. Our task in this case is therefore to determine whether the defendants based their decisions on grounds which impermissibly abridge plaintiff's constitutional rights, or on considerations prohibited by their own regulations, or both.

## I.

Plaintiff had become a controversial figure in 1971 while teaching at Stanford University. On March 22 of that year the University President, Richard W. Lyman, filed a Statement of Charges against Franklin, alleging that he had participated in various campus disruptions and made speeches inciting others to lawless actions. Because of the im-

portance the subsequent hearing on those charges and the circumstances which gave rise to them will assume in the resolution of the matter now before the Court, it is necessary to recount those events in some detail.

Pursuant to university regulations an Advisory Board, composed of an elected body of seven faculty members responsible for the review of professional appointments and promotions, held hearings on the charges preferred. The Board initially determined that the standard it would utilize in considering speeches by Professor Franklin was that suggested by the Supreme Court in *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). It concluded that Franklin could not be found culpable unless any advocacy was directed to inciting or producing imminent lawless action, and was likely to produce such action. It further determined that Franklin could be found culpable of any charge only by "strongly persuasive," rather than a mere preponderance of, evidence.

The opinion rendered by the Advisory Board at the end of the hearings dealt for the most part with charges arising from what became known as "the Lodge incident" and from the events of February 10, 1971. As to the former, it was alleged that on January 11, 1971, Ambassador Henry Cabot Lodge attempted to deliver an address in the Dinkelspiel Auditorium, but was prevented from doing so by the disruptive conduct of various people in the audience. That conduct including loud shouting, chanting, and clapping. It was charged that Professor Franklin was in the audience and knowingly and intentionally participated in the disruptive conduct.

Although the disruption was not denied, the evidence was conflicting as to the extent of Professor Franklin's participation. The Board concluded that while Franklin did engage in loud shouting on at least two occasions when the rest of the audience was quiet, and possibly at other times as well, the evidence was not strongly persuasive that this shouting

took place during the time Lodge was at the podium, nor was it strongly persuasive that Professor Franklin's conduct included "chanting and clapping" as specified in the charges. The Board therefore unanimously refused to sustain the specific charge. It did, however, note that Professor Franklin's right to speak must be balanced not only against the rights of Mr. Lodge to speak, but also against the rights of others to hear and to assemble peacefully. It could not accept the view that the interruption of University functions, let alone their disruption, was a part of the appropriate function of a faculty member at Stanford.

As to the events of February 10, 1971, the Advisory Board observed at the outset that the "climatic events" of that date did not occur without warning. Dissatisfaction with the Indochina war was rising again because of rumors that an invasion of Laos was about to begin, perhaps with participation of American armed forces. In addition, the Stanford Judicial Council had been holding hearings on charges brought against students accused of disrupting the January speech of Ambassador Lodge. The preceding several days had been characterized by overt turbulence and escalating protest activities.

Beginning at about noon on February 10, a rally took place at the White Memorial Plaza. It was charged that Professor Franklin intentionally urged and incited students and other persons present at the rally to disrupt University functions and business, and specifically to shut down a University computer facility known as the Computation Center.

Franklin had concluded his speech at that rally by stating:

See, now what we're asking is for people to make that little tiny gesture to show that we're willing to inconvenience ourselves a little bit and to begin to shut down the most obvious machinery of war, such as, and I think it is a good target, that Computation Center. [applause and shouts of "right on . . . ."]

Shortly thereafter a large number of students and others left the rally and went to the Computation Center and many did occupy the Center, prevent its operation, and obstruct movement in and out of the building for several hours.

The Advisory Board concluded that, in the context of the events of the previous few days, other statements by Franklin, and the political climate at that time, Professor Franklin must reasonably have expected that his speech at White Plaza would increase the likelihood of illegal occupation of the Computation Center immediately following his speech, and that there was risk of serious damage to the computer and its users. It found the evidence strongly persuasive that Professor Franklin had urged and incited his audience at White Plaza towards disruption of University functions and the shutdown of the Computation Center. The Stanford Advisory Board unanimously sustained the charge.

The next charge concerned the events at the Computation Center itself. After making the White Plaza speech, plaintiff had gone to his 1:15 class. When he discovered that only seven of the 150 students enrolled were present, and that many were at the computer center, he moved the class to an area outside the center. After the center had been illegally occupied for about three hours, during which time some damage had occurred and the occupiers had refused University requests to leave, police declared the occupation unlawful and ordered the demonstrators to disperse. Professor Franklin and others protested. When a police official denied Franklin's protest, it was alleged that he strode into the crowd, denying the legality of the police order to disperse and shouting at another professor to stay as a "faculty observer." Three witnesses testified that he then urged the crowd to defy the police order, although Franklin denied this, and the evidence was conflicting.

The Board found, with two members dissenting, that the evidence was strongly persuasive that Professor Franklin did intentionally urge and incite others to

disobey the order to disperse, thereby increasing the danger of arrest or injury to others present.

On the evening of February 10, a rally was held in the Old Union Courtyard to, among other things, discuss methods of protesting developments in the war in Indochina. It was asserted that during the course of the rally Professor Franklin spoke twice and intentionally urged and incited students and other persons present to engage in conduct calculated to disrupt activities of the University and of members of the University community, which threatened injury to individuals and property. Shortly thereafter students and other persons were allegedly assaulted by persons present at the rally, and later that evening other acts of violence occurred.

In his first speech that evening Professor Franklin spoke with concern about people who must spend time in jail, emphasized solidarity within the "movement," and opposed betrayal of political prisoners. In an "intense" delivery, he then said in part that the people get very upset when they find their beautiful campus "crawling with pigs who stop and harass people and rip off and beat half of the people." He urged that others be taught about such evils as Stanford's complicity in the war and about the necessity to free all political prisoners. Franklin expressed the view that the student "strike" a year earlier had been a success, and he then closed by restating the necessity to continue the struggle to win others to his viewpoint.

Later in the rally Professor Franklin spoke again for about two minutes. At the hearing Franklin testified that in his second speech he told those from another organization that it was important for people to understand that it was a united front, and that people will respond on different levels of action and with different degrees of consciousness to the war. He ended by telling them that the "people's war" meant that they should go back to the dormitories, organize people into small groups, and talk with them, or play football, or whatever, as late into the night as possible, so as to keep the police occupied.

Other witnesses testified that Franklin concluded by suggesting that people go back to their dormitories, meet in small groups, and decide to do "whatever they wanted to do as late at night as possible so as to bring more police onto the campus to help out their brethren in other communities." At this point, in one witness' opinion, the nature of the meeting changed dramatically, leading him to expect that illegal or disruptive incidents would follow. Another witness thought the crowd got very excited as a result of the speech. Another thought that Franklin's statements were "inflammatory."

Witnesses for Professor Franklin heard phrases similar to those reported by Administration witnesses but interpreted them not to include militant action. However, some apparently did testify that "people's war" to them included harassment of police and doing whatever the conscience dictates, which might include "trashing."

Taking into account the content, context, and delivery of the speeches, as well as the makeup of the audience to which they were delivered, the majority of the Advisory Board found that the urging of immediate retaliatory action towards the police and University was clear. It concluded that Franklin intentionally urged and incited his audience to engage in conduct which would disrupt activities of the University and of members of the University Community and threaten injury to individuals and property.

Two members of the Board again dissented. While admitting it was quite possible that Professor Franklin advocated a range of actions some of which may have been illegal, and that the speeches might be said to have added, along with other speeches at the rally, to the risk that prohibited conduct might follow, the dissenters did not find the evidence strongly persuasive that his speech constituted the advocacy of imminent lawless action.

In determining the appropriate sanction the Stanford Advisory Board observed that Professor Franklin always attempted to stay on the permissible side of conduct, in order to preserve his position at the University, while at the same time hoping that illegal acts would come about and doing what he could within the law to encourage them. It noted that the continuous probing of the University's will to enforce its rules might lead to a high likelihood of future transgressions, quite apart from the Board's findings of fact on the charges before it. Thus, while appreciating that dismissal was a penalty of undoubted severity, the majority of the Advisory Board believed that immediate dismissal of Professor Franklin from the University was warranted. The two dissenters found this to be too severe, each instead recommending suspension for a period of time.

Plaintiff contends that his activities at Stanford fell within the constitutional protection of the First Amendment, and that a decision not to hire could not be based upon that conduct. It is further asserted that the Regents were precluded from even considering the Stanford incidents, absent a prior judicial determination that Franklin's activities there were not constitutionally immune. Finally, plaintiff contends that the decision of each defendant was in any event based primarily, if not solely, on disagreement with plaintiff's political views and advocacy of those views, as well as his past association with revolutionary groups. The Court will consider the last contention first.

## II.

 It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or association at the schoolhouse gate. *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). It has been said that no more direct assault on academic freedom can be imagined

than for school authorities to be allowed to discharge a teacher because of his or her political, philosophical, or ideological beliefs, *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 581, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (Mr. Justice Douglas, dissenting), and the same would be true of a decision not to hire. Thus, the University, as an instrumentality of the State, may not restrict speech or association, even by the subtle and indirect coercion of refusal to hire, simply because it finds the views expressed by any group or individual to be abhorrent. *See, Healy v. James, supra,* 183, 187–88, 92 S.Ct. 2338.

There are those who may think it ironic that in our system of government the zealous protection of free speech requires that the mantle of free expression be extended to those who seek it so that they may advocate the violent overthrow of that very system, while condemning the right of others to express views opposed to their own. But the protection of the citizen in the expression and even advocacy of these views is vital in creating the vibrant atmosphere in which the search of scholarship can best flourish. Our Supreme Court has often recognized the necessity of such protection:

> The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government. *De Jange v. Oregon,* 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937); *Keyishian v. Board of Regents,* 385 U.S. 589, 602, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).

"The vigilant protection of constitutional freedoms is nowhere more vital

than in the community of American schools." . . . The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." . . *Keyishian v. Board of Regents, supra,* at 603, 87 S.Ct. at 683.

To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die. *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Keyishian v. Board of Regents, supra,* 385 U.S. at 603, 87 S.Ct. 675, 684.

A refusal to hire therefore may not be cloaked with the justification that the refusal is in the best interests of the University, if the true underlying rationale is personal disagreement with the applicant's viewpoints and associations for, as just seen, the Board members' own interests are not necessarily identical to the best interests of the school. *Pickering v. Board of Education,* 391 U.S. 563, 571, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■ The Court agrees with plaintiff that defendants not only could not base the decision disapproving his appointment on the above justification, it could not base it upon a concern that the appointment would generate controversy on campus, if the cause of that controversy were merely the political views and associations of plaintiff. Neither could the decision be grounded upon a fear that a Regent's constituency would not approve the appointment of a Marxist, or that the state legislature or certain alumni would reduce the financial support received by the University. Nor could it even be based on the fact that plaintiff believed in the necessity of political assassination under certain circumstances, and believed that Ambassador Lodge should be treated as a war criminal, to be tried and executed as at Nuremburg. In sum, no matter how abhorent Franklin's political or philosophical views may seem to some, their advocacy may not be made the basis of a refusal to hire, at least where it does not affect the employment relationship or disrupt school discipline, as will be more fully discussed.

■ The Court further agrees that the quite candid testimony of various Regents reveals that each of the above considerations were in fact taken into account to at least some extent by one or more of the defendants. This does not, however, necessarily mean that the defendant is entitled to the relief requested. To be entitled to relief because of these impermissible considerations, plaintiff must further show that one or more of them was the *paramount* reason for the refusal to hire. *See, Bertot v. School District No. 1, Albany County, Wyoming,* 522 F.2d 1171, 1182 (10th Cir. 1975).

> [I]f judged by constitutional standards, there are valid as well as invalid reasons for the discipline or discharge of a teacher, such discipline or discharge will not be set aside by the federal courts so long as the invalid reasons are not the *primary* reasons or motivation for the discharge. *Starsky v. Williams,* 353 F.Supp. 900, 916 (D.Ariz. 1972) (emphasis added).

Otherwise, a teacher could engage in unpopular activities simply to insure the permanency of his employment. Note, *Civil Rights—Academic Freedom—Refusal to Rehire a Nontenured Teacher for a Constitutionally Impermissible Reason,* Part B, *Refusing to Rehire a Teacher in a Situation Where Both Constitutionally Permissible and Impermissible*

*Reasons are Present: A Problem of Selective Enforcement,* 1970 Wis.L.Rev., 168–69.

There can be no more difficult task for a court than to try to discern the thought processes which led to a certain result, much less to ascertain the *primary* motivation. In this case it is necessary to carefully consider the evidence relating to each defendant.

Defendant Robert Gilbert testified that he became convinced that Franklin did not believe in academic freedom, and that this was a major reason in denying the appointment. He also testified that it was important that Franklin believed in political revolution, and had advocated the necessity of political assassination. It significantly affected his decision that Franklin had said after the Lodge incident that more force should have been used.

The true import of Mr. Gilbert's concern, however, is indicated by the fact that he was convinced that Professor Franklin was stating what he thought *he* should have done during the Lodge incident. For Mr. Gilbert this apparently indicated a propensity toward unlawful conduct, not merely advocacy of political views. The evidence shows that Gilbert sought out articles on academic freedom so as to better understand the difference in academic freedom and conduct destructive of that freedom. In the end he gave the "most weight" to the findings of the Advisory Committee at Stanford— findings by a group of Franklin's peers that plaintiff had engaged in culpable conduct—and determined that it was not in the best interest of the University to hire someone "involved extensively" in the Stanford turmoil.

The testimony of Regent Fred Betz shows that because Franklin advocated some "way out" answers to certain national problems Betz was concerned that plaintiff's appointment would generate controversy on the campus already caught up on the turmoil of the imminent dismissal of the University President. He was also bothered by certain statements in Franklin's article, "The Real Issues In My Case," relating to the opinion that there was need for revolutionary violence in a decaying society, and that it might be correct in certain circumstances to assassinate or kidnap political leaders, or to burn down the Stanford Computation Center.

While these concerns were in themselves not a sufficient basis for disapproving the appointment, further testimony again shows the dominant concern to have been with the past behavior of Mr. Franklin, not merely his philosophical views. For Mr. Betz the article merely showed the "full thinking" of Franklin, someone who had previously influenced students to violence. At the time of the second vote the element of controversy was no longer important, but Mr. Betz still voted against Franklin because he had concluded that Franklin had "crossed the line into disruption at Stanford." He further concluded that Franklin had incited people to prevent Lodge from speaking, even though plaintiff had been acquitted of the specific charges by the Stanford Advisory Board.

Regent Jack Anderson's votes were based on both Franklin's conduct and speeches in the past which for him formed a "pattern of conduct" of inciting disruptive activities. He therefore did not interpret the Franklin article as merely making a philosophical point. Mr. Anderson believed that the past conduct was indicative of possible future conduct. The evidence does show that he was concerned that University funding would be affected by the vote and that he was bothered that Mr. Franklin had in the past been associated with revolutionary groups. Defendant was also concerned about an incident involving a hospital disturbance in which Franklin allegedly participated, as communicated in the "Lindee letter." Even though Franklin later denied even being at the hospital at that time, Mr. Anderson remained unconvinced. He was further worried that the University President might be attempting to pit the faculty and students against the Regents in an effort to save his job. Ultimately, how-

ever, the "controlling factor," the "primary influence," was the pattern of conduct, the definite participation in disruptive activities as a member of the faculty with the students at a major university. For Anderson, the risk of the appointment outweighed any possible benefit.

Regent Eric Schmidt testified that he voted against Franklin on both occasions based on the Advisory Report, as well as the reticence of some members of the English Department to commend the public lectures of Franklin and some of his writings. He found it significant that the Stanford Advisory Committee had found Franklin culpable of three charges, including inciting students to occupy the Computation Center and violating a police order to disperse. He was bothered by the fact that the Stanford report showed that Franklin would go to the line of inciting people, and it did not appear that he had foresaken that type of behavior. Schmidt testified that his vote had nothing to do with Mr. Franklin's political views. It was rather that the risk of bringing him on campus made it not worth having a purported exceptional scholar, whose scholarship Mr. Schmidt described as adequate.

The testimony of Defendant Raphael Moses makes it clear that the "decisive factor" in his vote was the Advisory Report, describing Franklin's speeches and his actions at the Computation Center. He felt the speeches, combined with going to the center and his actions there, took Prof. Franklin's conduct out of the area of First Amendment behavior. The fact that Franklin was not charged with any crime at the time was "not the matter at issue" with Moses. It was rather the distinction between beliefs and actions.

Regent Thomas Moon testified that his vote was *not* solely based on the controversial nature of Franklin's political views, although he candidly admitted that this was one of the factors which he considered. He too was concerned that the appointment process was being abused by the University President. But again the overriding concern was that the appointment would increase the unrest on campus, due to the *method* Franklin used to implement his political philosophy. He was afraid the incidents at Stanford might be repeated at the University of Colorado.

Professor Byron Johnson found the problem to be with citizen Franklin. It was not that Franklin was a Marxist, or "per se" that he believed in violence to change government, but rather the past conduct of Franklin, as presented in the Stanford Advisory Report. He too was influenced by the alleged participation of Franklin in the hospital incident. For him the risks of hiring Franklin were the risks of the occurrence at C.U. of incidents such as those occurring at Stanford involving a group movement on a University. He found the full report of the Stanford Committee the "single most persuasive document," since he knew four members of that Committee were highly regarded. Professor Johnson concluded that Franklin had gone beyond free speech, and had breached the special obligation owed by the faculty to protect the "delicate flower of academic freedom."

Dr. Dale Atkins objected to the fact that Franklin advocated the use of force to bring about social and political change, and unequivocally stated that he would not hire anyone inciting or even advocating violence. While we have previously stated that it was not the prerogative of a regent to refuse the appointment merely because of Professor Franklin's political beliefs and the advocacy of them, Dr. Atkins found the "main objection" to be the things for which plaintiff had been found culpable at Stanford. He considered Franklin a "troublemaker."

There was other testimony as to statements that had been made by defendants at different times, and various statements were also disclosed in the minutes of the Regents' meeting. But nothing appears which overcomes the predominant theme underlying the votes of each defendant. The speeches and

activities of plaintiff at Stanford were the paramount reasons which led to the votes to disapprove his appointment, both because the defendants perceived that conduct as falling outside the realm of protected free speech, and because the pattern of conduct indicated to them a substantial risk of similar occurrences on the University of Colorado campus should plaintiff receive a faculty appointment. It is therefore necessary to turn to a consideration of that conduct, and the extent of protection afforded plaintiff by the constitution and university regulations.

### III.

The plaintiff having raised a claim of a violation of his rights to free speech and association, this Court must now make an independent examination of the evidence in order to insure that the controlling legal principles may be applied to the actual facts of the case. *Pickering v. Board of Education*, 391 U.S. 563, 578–79 n. 2, 88 S.Ct. 1731, 20 L.Ed.2d 811; *Starsky v. Williams, supra*, at 904. Apparently based on this premise, plaintiff analogizes the refusal of defendants to hire to various cases involving prior restraints on speech, which have limited the government's ability to prevent the showing of allegedly obscene material or to enjoin meetings. *E. g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Plaintiff concludes that the Regents could not base the refusal to hire on their own determination that Franklin's conduct at Stanford was not constitutionally protected, absent a *prior judicial determination* that his conduct was in fact not constitutionally immune from governmental sanction. We reject plaintiff's conclusion.

While it is true that the effect of the University's action is a form of prior restraint, *Healy v. James, supra*, 408 U.S. at 184, 92 S.Ct. 2338, the Supreme Court has never interpreted this to mean that there must be a prior judicial determination of no constitutional immunity before a university can act. The Supreme Court has in fact explicitly rejected plaintiff's analogy as a basis of requiring prior judicial consideration, and held that there is not even a right to a prior administrative hearing. This is because

. . . the State has not directly impinged upon interests in free speech or free press in any way comparable to a seizure of books or an injunction against meetings. Whatever may be a teacher's rights of free speech, the interest in holding a teaching job at a state university, *simpliciter*, is not itself a free speech interest. *Board of Regents of State College v. Roth*, 408 U.S. 564, 575 n. 14, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548; *Perry v. Sindermann, supra*, at 599 n. 5, 92 S.Ct. 2513; *Skehan v. Board of Trustees of Bloomsburg State College*, 501 F.2d 31 (3d Cir. 1974).

Thus, while the judicial decision must be based on an independent determination of the actual facts, that determination does not have to precede university action. Further, in making its independent determination, the Court may give due weight to the findings of an administrative hearing at a university, where such findings were reached by correct procedures and supported by substantial evidence. *Duke v. North Texas State University*, 469 F.2d 829, 838 (5th Cir. 1973); *Ferguson v. Thomas*, 430 F.2d 852, 859 (5th Cir. 1970); *Starsky v. Williams, supra*, at 904.

The Court does agree that since the effect of the Regents' action is a form of prior restraint, where the existence of a constitutional right is established there is a heavy burden upon defendants to demonstrate the appropriateness of their action, *Healy v. James, supra*, 408 U.S. at 184, 92 S.Ct. 2338; *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966), and this burden must be met by clear and convincing evidence. *Smith v. Losee*, 485 F.2d 334, 339 (10th Cir. 1973). However, the initial burden of

demonstrating the existence of the constitutional right is upon the plaintiff. *Id.* In this case, the burden was upon plaintiff to demonstrate that his conduct at Stanford was constitutionally immune from criminal sanction.

The evidence presented other than Franklin's own testimony included his letters and articles, letters and articles by others commenting on the Stanford incidents, including a letter from Charles C. Marson, Legal Director of the American Civil Liberties Union of Northern California, and of course the Advisory Report of the Stanford Advisory Board. The characterization of Franklin's activities at Stanford presented by this evidence is naturally conflicting. At least one of the charges against Franklin was sustained by the unanimous vote of the Advisory Board, but it must in all fairness be pointed out that, while ostensibly applying the *Brandenburg* criminal standard of liability for incitement, the Board at various times referred to the fact that Franklin could "reasonably have expected that his speech would have contributed to the likelihood of the occupation" and that he "could reasonably have expected" that it would "increase the likelihood of illegal occupation of the Computation Center immediately following his speech, and that there was risk of serious damage to the computer and its users." Both references appear to incorporate a lesser standard of liability than the *Brandenburg* test. It is not clear whether the members of the Board realized this difference, or whether the findings of culpability were based on one of these references or a conclusion that the *Brandenburg* standard had been met. Moreover, neither this Court nor any of the defendants have read the actual transcript of those hearings, and the bulk of the evidence presented in this case as to what transpired at Stanford was hearsay. In short, it is impossible for the Court to determine the extent of constitutional immunity that plaintiff should be afforded from criminal culpability for his conduct at Stanford, based on the evidence presented. However, it is not necessary to resolve this issue, for it is clear that whether or not Franklin's conduct there was unlawful, defendants have met their burden of demonstrating the appropriateness of their actions.

## IV.

 In stressing that neither Stanford nor the University of Colorado could in any way sanction or even consider the conduct of Franklin at Stanford unless it were judicially determined that his conduct was criminally culpable, plaintiff fails to

> carefully distinguish the exercise of [First Amendment] rights peculiarly involved in the employer-employee relationship from broader rights of speech and association. *Local 858 of A.F. of T. v. School District No. 1 in Co. of Denver,* 314 F.Supp. 1069 (D.Colo.1970).

Further, First Amendment rights must always be applied in light of the special characteristics of the environment in the particular case and, where state-operated educational institutions are involved, the Supreme Court has long recognized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. *Healy v. James, supra,* 408 U.S. at 180, 92 S.Ct. 2338. The Supreme Court in *Healy* concluded that school authorities could sanction conduct materially and substantially disrupting school discipline, even though that conduct was perhaps not unlawful.

> In the context of the "special characteristics of the school environment," the power of the government to prohibit "lawless action" is not limited to acts of a criminal nature. Also prohibitable are actions which "materially and substantially disrupt the work and discipline of the school. . . . Associational [and speech] activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education. *Healy v. James,*

*supra*, 408 U.S. at 189, 92 S.Ct. at 2350.

Mr. Justice Rehnquist stressed this distinction in his concurring opinion:

> The government as employer or school administrator may impose upon employees and students reasonable regulations that would be impermissible if imposed by the government upon all citizens. And there can be a constitutional distinction between the infliction of criminal punishment, on the one hand, and the imposition of milder administrative or disciplinary sanctions, on the other, even though the same First Amendment interest is implicated by each. *Id.* at 203, 92 S.Ct. at 2357.

That school authorities may balance the rights of teachers to speak out on matters of public concern against the interests of the University as an employer, and act upon the basis of conduct found to be materially or substantially disruptive, though not unlawful, is not a novel proposition. *E. g., Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Bertot v. School District No. 1, Albany County, Wyoming*, 522 F.2d 1171 (10th Cir. 1975); *Whitsel v. Southeast Local School District*, 484 F.2d 1222 (6th Cir. 1973); *Duke v. North Texas State University*, 469 F.2d 829 (5th Cir. 1973); *Siegel v. Regents of University of California*, 308 F.Supp. 832 (N.D.Cal.1970). This Court recognized the distinction in *Trujillo v. Love*, 322 F.Supp. 1266, 1270 (D.Colo. 1971), where we stated:

> In the context of an educational institution, a prohibition on protected speech, to be valid, must be "necessary to avoid material and substantial interference with schoolwork or discipline."

Thus, though Franklin's conduct at Stanford may not have been criminally culpable, the fact that the defendants based their refusal to hire on that conduct would not have been constitutionally impermissible, if in fact his actions materially and substantially interfered with University activities and discipline there. After independently reviewing the record, we are convinced by "clear and convincing" evidence that it did.

## V.

As plaintiff concedes, a separate but related basis for the refusal to hire which could have been and was relied upon was the fear of disruptions on the University of Colorado campus. Certainly, in a situation of potential disruption there is no requirement in the law that the proper authorities must wait for the blow to fall before taking remedial measures, *Birdwell v. Hazelwood School District*, 491 F.2d 490, 494 (8th Cir. 1974), for it is the duty of school officials to *prevent* the occurrence of disturbances. *Haynes v. Dallas County Junior College District*, 386 F.Supp. 208 (N.D.Tex.1974). However, plaintiff contends that the Board's action could permissibly be based on the fear of disruption only if Franklin had demonstrated a "clear and present intent to materially and substantially disrupt University functions or violate reasonable University rules or regulations." While the Court agrees that an undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression, *Tinker v. Des Moines, supra*, 393 U.S. at 508, 89 S.Ct. 733, we think the correct test is whether there was a sufficient evidential basis to support a reasonable conclusion that Franklin posed a substantial threat of material disruption. *Healy v. James, supra*, 408 U.S. at 189, 92 S.Ct. at 2338; *Esteban v. Central Missouri State College*, 415 F.2d 1077 (8th Cir. 1969); *Birdwell v. Hazelwood School District*, 352 F.Supp. 613 (E.D.Mo.1972), *affirmed*, 491 F.2d 490 (8th Cir. 1974).

Having independently reviewed the evidence, the Court finds that there were facts which reasonably led the several defendants to forecast material disruption of school discipline and the employment relationship, were Professor Franklin to be appointed to the faculty of the

University of Colorado, and we further find the refusal to hire to be an "appropriately related and narrow response." *Healy v. James, supra,* 408 U.S. 189–90 n. 70, 92 S.Ct. 2338. It is important to note that the forecast was not of conduct of a citizen unrelated to the University, or even public criticism of the University by a potential employee, but rather was the forecast of actions disrupting University activities materially and substantially, perhaps even bringing injury to persons at or the property of the University which was to hire him. The relief requested by plaintiff under § 1983 must therefore be denied.

It is necessary that the precise holding in this case be understood. The Court has only concluded that this is *not* a case of refusal to hire based primarily on objections to political beliefs, the advocacy of those beliefs, or associations with various political movements. *See, Hetrick v. Martin,* 480 F.2d 705, 708 (6th Cir. 1973). By denying the requested relief the Court does not mean to intimate any viewpoint on the wisdom of hiring or not hiring Professor Franklin. The Court is aware that when widespread publicity and denunciation accompany the imposition of disabilities, the result may be public disgrace and ostracism having a far greater deterrent effect on speech than would be the deprivation of benefits alone. Notes and Comments, *Civil Disabilities and the First Amendment,* 78 Yale L.J. 842, 860 (1968–69). If in fact Professor Franklin were unjustly charged and found culpable at Stanford, it would be most unfortunate that such action could bar Professor Franklin from employment elsewhere. But absent constitutional violations it would be intolerable for the courts to interject themselves, emasculate the discretion of the Regents, and require an educational institution to hire a professor whom it deemed undesirable and did not wish to employ, for Courts are not equipped by either training or experience to select the faculty for colleges and universities. *See, Duke v. North Texas State University, supra,* at 838. In this case, to require defendants to hire Professor Franklin or to grant damages would go beyond redress of his constitutional rights. This we cannot do.

## VI.

Article 10, § C of the Laws of the Regents, entitled "Academic Freedom," provides in pertinent part that the discretion of the Board of Regents to appoint faculty members is limited to consideration of the

> individual's ability in teaching, research, writing or other scholarly activities and should not be influenced by such extrinsic considerations as his political, social, or religious views.

. . .

As we earlier observed, various defendants did take into account certain constitutionally impermissible considerations in reaching their individual decisions, and to the extent that these considerations included plaintiff's political or social views those defendants did violate the Laws of the Regents. However, as also previously noted, the primary motivation of each defendant in disapproving the appointment was either that Professor Franklin had engaged in disruptive conduct at Stanford directed at that University, or that there was a substantial threat, based on the pattern of his past conduct, that he would engage in such activity at the University of Colorado, or both. The refusal to hire based on these considerations is not only constitutionally permissible, but also in conformity with the Laws of the Regents. Since it is apparent that the outcome of the vote would remain unchanged even ignoring the considerations proscribed by University regulation, it would be futile to grant plaintiff the injunctive relief sought under those regulations.

Judgment shall enter for defendants in accordance with the foregoing opinion.