David K. RUHLMAN

v.

Patrick J. HANKINSON and Robert B. Gorman.

Civ. A. No. 76–73 Erie.

United States District Court, W. D. Pennsylvania.

Nov. 7, 1978.

See also D.C., 435 F.Supp. 447.

H. William White, Franklin, Pa., for plaintiff.

Frederick R. Nene, Asst. Atty. Gen., Department of Justice, Pittsburgh, Pa., for defendants.

MEMORANDUM DENYING MOTION FOR NEW TRIAL OR IN THE ALTERNATIVE TO AMEND THE JUDGMENT

1. A directed verdict was granted at the close of plaintiff's case in favor of a third defendant, James D. Barger, Commissioner of the Pennsylvania State Police.

KNOX, District Judge.

Plaintiff, a former Pennsylvania State Police sergeant, filed this civil rights suit against defendants,[1] his superior officers, alleging that they violated his civil rights by transferring him from his assignment in Franklin, Pa. to a post in Erie, Pa. Plaintiff contended (1) that the transfer was in retaliation for his exercise of his First Amendment right to freedom of speech, specifically his counselling of the troopers at the Franklin station to oppose the imposition of a quota system relating to numbers of arrests and traffic citations and his revelation of this quota system to a local newspaper reporter[2] and (2) that the transfer denied him due process of law under the Fourteenth Amendment and administrative due process under State Police regulations. This case was tried before a jury in June, 1978, and resulted in a finding in favor of defendant Gorman and against the plaintiff and in favor of plaintiff and against defendant Hankinson. The jury completed a special verdict (a copy of which is attached) and awarded plaintiff $50,000. Judgment was entered on this verdict on June 19, 1978, following which defendant Hankinson filed the motions under consideration here pursuant to FRCP 59(a) and (e). Both motions must be denied.

## MOTION FOR NEW TRIAL

Initially, the court notes that at trial plaintiff discarded his contention that his transfer constituted punishment for having revealed the existence of the quota system to the press,[3] and proceeded on the alternative First Amendment theory that he was transferred for his discussions with certain troopers concerning his, and their, opposition to the quota system. Although this alternative claim was not set forth specifically in plaintiff's pre-trial narrative, and although parties are confined to the issues enumerated in such narratives, plaintiff's pretrial statement does incorporate by ref-

2. This latter theory was abandoned by plaintiff at trial, as discussed hereinafter.

3. His revelation to the press occurred after his transfer.

erence plaintiff's memorandum in opposition to defendants' motion for summary judgment. This memorandum states: "What the plaintiff maintains . . . is that he was punished because he openly exhorted the Troopers to oppose the quota system and because he did 'buck the system,' the command made an example of him." (p. 8) Consequently, plaintiff's abandonment of one free speech theory and advancement of another at time of trial could not have resulted in any surprise or prejudice to defendants since they were put on notice that plaintiff was proceeding on both theories.

It is well established that in considering a motion for new trial following a jury verdict, a court should refrain from interfering with the verdict unless it is clear that the jury reached a seriously erroneous result. *Draper v. Erie R. R. Co.*, 183 F.Supp. 899 (W.D.Pa.1960), aff'd 285 F.2d 255 (3d Cir. 1960). Further, plaintiff herein is entitled to have the evidence viewed in the light most favorable to him and to have "the benefit of all inferences which the evidence fairly supports". *Continental Ore v. Union Carbide*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Finally, "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable". *Tennant v. Peoria & Pekin*, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944). Applying this standard of review to the instant case, we proceed to a consideration of the merits.

It is now firmly established that public employees enjoy the protection of the First Amendment's guarantees. *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). It is also recognized, however, that the government has a legitimate interest in regulating the nature and extent of its employees' public statements. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Depending upon the nature of the employment relationship in question, the government is entitled to maintain some degree of flexibility with respect to the parameters of this regulation. Certainly, the unique circumstances involved in police department employment, as in the instant case, may necessitate a greater restriction on a police officer's freedom of speech in order to maintain discipline than would be required of other government employees. As stated by the Court of Appeals for the Seventh Circuit: "To the extent that being a policeman is public employment · with unique characteristics, the right of the employee to speak on matters concerning his employment with the full freedom of any citizen may be more or less·limited. It is not, however, destroyed". *Muller v. Conlisk*, 429 F.2d 901, 904 (1970).

In the instant case, defendant Hankinson contends that although as a policeman plaintiff may have been entitled to some degree of protection under the First Amendment for statements made in public, the exhortations he made to the troopers at the Franklin station to oppose the quota system were unprotected private communications. Defendant's reliance on the denial of free speech protection given to the private utterances in *Roseman v. Indiana Univ. of Pa., at Indiana*, 520 F.2d 1364 (3d Cir. 1975) for this proposition, however, is misplaced. Although the court in *Roseman* did distinguish its factual situation from that in *Pickering* on the basis of the private nature of the former as opposed to the public nature of the latter, the court coupled the forum issue with a distinction based on the degree of public interest involved in the statements made by *Roseman*. The court held that *Roseman's* communications "concerned an issue of less public interest than *Pickering's*." 520 F.2d at 1368. Significantly, the court stated that "if Roseman's [private] communications to McGovern and at the faculty meeting had been on issues of public interest, *or* if she had convinced local news media that her grievance against Faust was newsworthy, entirely different considerations would come into play." 520 F.2d at 1368, fn. 11 (emphasis added) Thus, the court recognized that although a communication may be essentially private in its scope, it is nevertheless entitled to First Amendment

protection if it concerns a matter of legitimate public interest.

■ The jury in this case was instructed concerning the requirement that plaintiff's statements to the troopers encompass "a matter of legitimate public concern" in order to entitle plaintiff to protection, and the jury found specifically that they did. (See Special Verdict, question # 2). Consequently, although plaintiff's communications to the troopers were essentially private, since they related to a matter of legitimate public concern, they were entitled to be analyzed as protected free speech.

Having determined that plaintiff's statements were not precluded from First Amendment protection because of the private nature of the forum in which they were uttered, it is necessary to determine whether under the standard for analysis established in *Pickering* the statements remained within the ambit of the First Amendment or fell outside of its umbrella. In *Pickering*, the Court stated: "The problem in any case is to arrive at a balance between the interests [of the employee], as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1735, 20 L.Ed.2d at 817. The Court then enumerated several factors which were to be scrutinized and weighed in arriving at this balance. These elements included (1) the impact of the statements on co-worker harmony, (2) the proximity of contact between the speaker and the subject of the criticism, (3) the sensitivity of the employer-employee relationship, and (4) the degree of interference with the regular operation of the enterprise or with the performance of the speaker's duties.

In the instant case, there was no evidence that plaintiff's discussions with the troopers had an adverse effect on co-worker harmony. The testimony established that throughout the summer and fall of 1974,

Patrol Sgt. Henry T. Lorent stated to various troopers that they should "think 15" or "think 20" arrests or citations per month, and urged them to "pork 'em" as they left the Franklin station to begin their patrols. He cautioned them that if they failed to meet their monthly quotas, they could be transferred, given undesirable duty assignments, or punished in some other, perhaps more subtle, fashion. Several troopers testified that they were so concerned about this quota system that they approached plaintiff, who was known to be accessible, and used him as a sounding board for their complaints.[4] Plaintiff advised them that the system was improper, that they should stress quality rather than quantity in their work, and that Lorent's directives were wrong. This evidence established that a definite morale problem existed at the Franklin station in late 1974 and early 1975 and that many troopers disagreed with, and perhaps disliked, Sgt. Lorent. Without question, however, this low morale, with its potential adverse effect on co-worker harmony, was engendered by the imposition of the quota system by Sgt. Lorent, not by any attempt on plaintiff's part to disrupt the system. Sergeant Ruhlman did not initiate the unrest at the Franklin station; on the contrary, he attempted to alleviate it. All witnesses agreed that he was always respectful and obedient to his superiors.

The second factor discussed in *Pickering* is the closeness of contact between the speaker and the subject matter of the criticism. In the instant case, it is true that plaintiff was in as good a position as anyone at the station to observe the effects of the quota system upon the troopers and to comment upon it. The troopers selected him as their sounding board and he counseled them in accordance with his conscience. It is also significant to note, however, that after several troopers complained to him about the system, he informed Gorman of their unrest. Although there was no evidence that plaintiff ever talked directly to Hankinson

---

**4.** A quota system may be defined as a requirement that each trooper make a certain number of arrests per month or per week, whether justified or not. This naturally causes an out-

cry among the public and disrespect for law enforcement; particularly at the end of the quota period.

about the matter or that Gorman conveyed his conversation with Ruhlman to Hankinson, the jury could reasonably have inferred that Hankinson was aware both of the low morale at Franklin and of its cause. Consequently, Hankinson would have had every opportunity to rebut plaintiff's statements or to take action to quell the unrest by instructing Lorent to refrain from employing a quota system. Thus, although it may have been preferable for plaintiff to have discussed the matter directly with Hankinson, the jury could have inferred that both the employer and the employee had access to the facts and that Hankinson could have rebutted any statements made by plaintiff without having to suppress him.

In *Pickering*, the Court noted that "significantly different considerations would be involved" in cases where "the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine" the effective relationship between them. 391 U.S. at 570, fn. 3, 88 S.Ct. at 1735, fn. 3. In *Sprague v. Fitzpatrick*, 546 F.2d 560 (3rd Cir. 1976), the Third Circuit held that such a relationship existed between the Philadelphia District Attorney and his First Assistant. The court held that no First Amendment rights were violated when the First Assistant was discharged for having impugned the integrity of the District Attorney in public. In this case, the court notes that no evidence was presented which in any way indicated that plaintiff had been disparaging or defamatory toward his superiors. He did not engage in name-calling or the use of lewd, insulting, or "fighting words." On the contrary, the testimony clearly established that plaintiff was always respectful toward his superiors. Further, it is significant that, unlike the statements made by the plaintiff in *Sprague*, supra, the discussions by the plaintiff in this case were not even directed toward his immediate superiors. Instead, they concerned the quota system, a matter of grave concern to the troopers and to the general public, and, tangentially, Sgt. Lorent. Finally, the jury was instructed that if they found that

plaintiff maligned or defamed defendants, his speech would not be protected. Consequently, since plaintiff's statements to the troopers were not aimed at defendant Hankinson, but at a matter of public interest, the sensitivity of the relationship between plaintiff and Hankinson was not undermined.

The most troublesome element of *Pickering*, as applied to this case, is that of interference with the regular operation of the station. There is no doubt that plaintiff did exhort the troopers to disobey any attempt on the part of Lorent to impose a quota system. The impact of this exhortation on the operation of the station is the disputed issue.

It has been held that otherwise protected speech must "materially and substantially" disrupt the operation of the enterprise before it can be said to have relinquished this protection. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Hastings v. Bonner*, 578 F.2d 136 (5th Cir. 1978); *Mabey v. Reagan*, 537 F.2d 1036 (9th Cir. 1976). In this case, as discussed above, although disruption of the operation of the station may have occurred in that morale was low and some troopers did not fulfill their quotas, any such disruption was precipitated by the imposition of the quota system rather than by plaintiff's discussions with the troopers. It is important to remember that plaintiff did not initiate any conversations with the troopers regarding the quota system; the troopers came to him requesting his advice. The unrest existed because the troopers were disgruntled as a result of Lorent's thinly-veiled threats to them; plaintiff merely attempted to alleviate the strain and unhappiness by counselling the troopers that it was not wrong to disobey an improper order.

Defendant Hankinson contends, however, that plaintiff's statements constituted a call to mutiny, thereby creating a *potential* for disruption which Hankinson was obligated to suppress. It has been held that "In a situation of potential disruption there is no requirement in the law that the proper authorities must wait for the blow to fall

before taking remedial measures." *Birdwell v. Hazelwood School Dist.*, 491 F.2d 490 (8th Cir. 1974). It has also been held, however, that the speech must pose a "substantial threat to material disruption," in order to remove it from the protection of the First Amendment. *Franklin v. Atkins*, 409 F.Supp. 439 (D.Colo.1976); see, *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). Given that the evidence in this case established that discontent among the troopers had existed from mid-1974, some 6 months prior to plaintiff's transfer, it cannot be said that such a "substantial threat" to further disruption existed.

In *Whitsel v. Southeast Local School Dist.*, 484 F.2d 1222 (6th Cir. 1973), the court upheld the discharge of a high school teacher who had made statements to an unauthorized assembly of students which encouraged disobedience to the directions given them by the principal and superintendent to return to their classes. The court held that plaintiff's words "went beyond the mere advocacy of ideas and counselled a course of action," and that plaintiff "was not terminated for the advocacy of ideas but for insubordination." 484 F.2d at 1229. Arguably, Sgt. Ruhlman's statements to the troopers could be viewed as insubordination. Indeed, it may have been preferable for him to have discussed the quota system issue with Hankinson directly. In *Whitsel*, however, the plaintiff was determined to have "inflamed" the existing situation and to have encouraged the students to disobey a legitimate directive from plaintiff's superiors. In the instant case, by contrast, plaintiff did not "inflame" the situation, but rather attempted to quell the unrest. Further, plaintiff counselled the troopers that they did not have to obey an order from another sergeant at the station which they, and he, believed to be unlawful.

■ Although plaintiff's case was thin, and the evidence did not compel the verdict reached, the jury was justified in finding that plaintiff was transferred for the exercise of protected rights rather than for insubordination. In a close case such as this, a court has no authority to overturn the jury's verdict unless its decision was clearly erroneous. The court is unable to hold that it was.

■ While the defendant advanced legitimate reasons for plaintiff's transfer (in the nature of an existing need for his services in Erie) unrelated to the quota system controversy, the jury was properly instructed that plaintiff's First Amendment speech need have been only "a substantial factor" in the transfer decision. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Consequently, viewing the evidence in the light most favorable to the plaintiff, as we must when considering a motion for new trial, the court concludes that the jury was justified in finding as it did and defendant Hankinson's motion for new trial must be denied. Having determined the First Amendment issue in favor of the plaintiff, the court finds it unnecessary to address the Fourteenth Amendment due process property right question.

## MOTION TO AMEND THE JUDGMENT

■ Defendant Hankinson contends that the $50,000 damage award is excessive and unwarranted and moves the court pursuant to FRCP 59(e) to amend the judgment by reducing the award. The standard of review of a jury's damage award is similar to that employed in the determination of a motion for new trial. Although an award may be high, it should stand if there is ample evidence to support it or unless it shocks the conscience of the court. *Grunenthal v. Long Island R.R. Co.*, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968); *Lebeck v. Wm. A. Jarvis, Inc.*, 250 F.2d 285 (3rd Cir. 1957). The court is not permitted to arbitrarily substitute its judgment for that of the jury. *Lloyd v. Monessen Southwestern Ry. Co.*, 174 F.Supp. 751 (W.D.Pa.1959).

In the instant case, plaintiff established that he had sustained liquidated damages in the amount of $28,921.43 as a result of the transfer. In addition, substantial evidence was presented relating to the emotional distress suffered by Sgt. Ruhlman and its accompanying physical side effects. Finally, testimony was offered to the effect that plaintiff had undergone a material personality change following the transfer.

Compensatory damages for emotional distress are recoverable in a civil rights action. *Paton.v. La Prade*, 524 F.2d 862 (3rd Cir., 1975); *Aumiller v. Univ. of Delaware*, 434 F.Supp. 1273 (D.Del.1977). Sgt. Ruhlman produced evidence of emotional distress amounting to more than "some pressure and embarrassment" which was found not to warrant a $10,000 damage award in *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir. 1977). Consequently, the court concludes that there was sufficient evidence to sustain the jury's award of $50,000. Defendant's motion to amend the judgment must be denied.

An appropriate order will be entered.

## SPECIAL VERDICT

The jury is directed to answer the following questions:

1. Was the plaintiff's transfer from Franklin to Erie in March, 1975 caused by his exercise of his right to free speech?

ANSWER: ____Yes____
(yes or no)

2. Was the matter on which plaintiff spoke a matter of legitimate public concern?

ANSWER: ____Yes____
(yes or no)

3. Was plaintiff's transfer for the purpose of punishment in violation of the regulation, Plaintiff's Exhibit 1, Page 15, effective February 4, 1975, without notice of charges or hearing?

ANSWER: ____Yes____
(yes or no)

4. Did the defendants act in good faith and with a reasonable belief that their actions were proper under the law?

Defendant Hankinson—ANSWER: ____No____
(yes or no)

Defendant Gorman—ANSWER: ____Yes____
(yes or no)

5. If your answer to 1 and 2 are yes _or_ your answer to 3 is yes, what amount of damages do you award plaintiff?

$ 50,000 ____ Hankinson   Yes   (Yes or No)

Gorman   No   (Yes or No)

6. Did the defendants act maliciously with malicious intention to deprive the plaintiff of his rights or do him injury?

ANSWER: _____   Hankinson   Yes   (Yes or No)
(yes or no)     Gorman   No   (Yes or No)

7. If so, what amount of damages for this item is included in your award for damages, if any?

$ 1 ~~or more~~ ____   amended by the court with the consent of the jury

W. W. Knox
District Judge

1. ___Marilyn Omeara___
2. ___Kurt A. Federoff___
3. ___Kenneth E. Snyder___
4. ___Renzo J. Armanini___
5. ___Timothy A. Martin___
6. ___Irene K. Haser___

Dated: 6–16–78